**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 94-3560

D. C. Docket No. 94-05014-2 LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

IRMA ESTELLA CALDERON ALRED,
ROY JAVON ALRED,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Florida

**(June 30, 1998)**

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and CLARK, Senior Circuit Judge.

BIRCH, Circuit Judge:

This consolidated appeal by Irma Estella Calderon Alred and Roy Javon Alred from convictions for their participation in a

marijuana distribution conspiracy presents trial and sentencing issues. The appeal raises challenges to the government's single conspiracy theory, its alleged misuse of the grand jury, the district court's disqualification of preferred counsel, determination of the accountable marijuana amounts, and enhancements for possession of firearms and a leadership role in the marijuana distribution operation. We affirm the convictions and Irma Alred's sentence. Because the district court erred by according a leadership role to Roy Alred for being a buyer/seller of marijuana, we vacate his sentence and remand for resentencing consistent with this opinion.

## I. BACKGROUND

From 1984 until 1994, a group of individuals, known as the "Alred Organization," in Holmes County, Florida, engaged in an extensive marijuana distribution conspiracy involving thousands of pounds of marijuana. They primarily purchased the marijuana in the Texas/Mexico area and transported it by vehicles to

2

Holmes County, where it was sold. The principal source for obtaining Mexican marijuana was defendant-appellant Irma Alred, who was Irma Calderon in the mid 1980's when the conspiracy began. After delivering approximately 300 pounds of marijuana to coconspirator Charles Douglas Mixon in Holmes County and remaining there until it was sold, she became an active participant in the organization. Defendant-appellant Roy Alred became acquainted with Irma Calderon when he flew to Houston, Texas, to obtain from her 200 pounds of marijuana, which he transported in a rental car to Holmes County for sale there. Subsequently, Irma Calderon moved to Holmes County and later married coconspirator Charlie Alred, Roy Alred's cousin.

Irma Alred continued to be integrally involved in obtaining marijuana from Texas/Mexico. Numerous shipments intercepted through traffic stops by law enforcement agents were destined for her. On occasion, the marijuana was concealed in an extra propane gas tank on trucks traveling from Texas to Holmes

County. Eventually, Irma and Charlie Alred separated and divorced. Thereafter, competition between Irma, Charlie and Roy Alred became not only a price war but also an aggressive recruitment of each other's customers as the wire intercept evidence at trial demonstrated.

On June 15, 1994, a federal grand jury for the Northern District of Florida returned a one-count, superseding indictment charging Irma Alred, Roy Alred, and seven codefendants with conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846.[1] Because some of the original codefendants pled guilty, only Irma Alred, Roy Alred, and three codefendants went to trial.[2] At least twenty-one smuggling ventures were documented by law enforcement

---

[1] In addition to Irma Alred and Roy Alred, the other seven defendants named in the superseding indictment were: Charlie Junior Alred, Virginia Lee Blackmon, Clayton Michael Blackmon, Ardis James ("Junior") Hightower, Thomas Robert White, Adrian Dickey Gonzalez, and O'Don Newell.

[2] The other three defendants who went to trial with Irma Alred and Roy Alred were Virginia Lee Blackmon, Michael Clayton Blackmon, and O'Don Newell.

4

seizures, wire intercepts, testimony from cooperating, former codefendants,[3] and other witnesses, such as Collis Hobby, Willard and Shirley Womble, Jose Cuellar, and Jesus Galaviz.[4]

Irma Alred, Roy Alred and the three remaining codefendants

---

[3] Former codefendants testified at trial against Irma Alred and Roy Alred. Junior Hightower sold marijuana for Irma Alred from December, 1992, until shortly before his arrest in 1994. Thomas White assisted Irma Alred by allowing her to park vehicles used to transport marijuana on his property. White became involved during Irma Alred's divorce proceedings when she needed a place to conduct business without her estranged husband and coconspirator, Charlie Alred's, knowledge. Adrian Gonzalez made deliveries of several hundred pounds of marijuana to Irma Alred in March and April, 1994. The marijuana was hidden in an extra propane gas tank concealed on trucks during the trip from Texas to North Florida. Following delivery of 200 pounds of marijuana in Holmes County, Gonzalez was stopped by the Florida Highway Patrol after leaving the North Florida area on April 22, 1994. Agents seized approximately $160,000 in cash from the extra propane tank on the truck that Gonzalez was driving.

[4] Hobby and Willard and Shirley Womble testified that, between 1986 and 1989, Roy Alred was a buyer/seller of marijuana in various transactions with them. On one occasion, the Wombles accompanied Roy Alred to Texas to obtain marijuana. Cuellar and Galaviz were stopped by law enforcement agents in the course of delivering marijuana to Roy Alred.

were convicted. Both Irma Alred and Roy Alred received sentence enhancements for being leaders or managers in the marijuana distribution conspiracy. Irma Alred was sentenced to 364 months of imprisonment, ten years of supervised release, and a fine of $25,000. Roy Alred was sentenced to 293 months of imprisonment and five years of supervised release.

On appeal, Irma Alred contests the district judge's disqualification of her counsel of choice. Roy Alred contends that the government misused the grand jury to investigate further his involvement in the marijuana distribution conspiracy after the case was scheduled for trial and that the district court erred in enhancing his sentence for possession of firearms and for being a leader in the marijuana distribution conspiracy. Both Irma Alred and Roy Alred challenge the single conspiracy theory under which the government prosecuted this case, which they argue involved multiple conspiracies, and the amounts of marijuana for which they were held accountable at sentencing. We address these

contentions as trial and sentencing issues and include the pertinent facts relating to each issue.

## II. ANALYSIS

A. <u>Trial Issues</u>

1. Choice of Counsel

Irma Alred argues that she was deprived of her Sixth Amendment right to counsel when the district court disqualified her original attorney and counsel of choice, John F. Daniel. Because Daniel represented both Irma Alred and her ex-husband and coconspirator, Charlie Alred, and the government had suggested that one of Daniel's former clients might testify against Charlie Alred, the district judge conducted a hearing approximately six weeks prior to trial to determine whether there was a conflict of interests. Although Irma Alred purported to waive any conflicts that might result from Daniel's representing Charlie Alred and her, the district judge, after questioning her,

was not convinced that her waiver was knowing and intelligent.[5]

---

[5] The district judge's questioning of Irma Alred and her responses establish his concern that her waiver of Daniel's dual representation of her codefendant and ex-husband, Charlie Alred, and her was not knowing and intelligent:

THE COURT: How would you like to think that your attorney told him [Charlie Alred] to cop the plea and come into court and testify against you? How would you like for your attorney to do that?
MRS. ALRED: I wouldn't like it.
. . . .
THE COURT: But it doesn't concern you that maybe he would, because he's Charlie's attorney, too, he's got to get the best deal he can get for him, right?
MRS. ALRED: Yes, sir. Sir, I don't know what to tell you.
THE COURT: Well, you're the only one that can do that. So just have a seat there a minute and let me speak to Mr. Charlie Alred . . . .
. . . .
THE COURT: All right, Ms. Alred, if you would come back, please. You have heard us discuss it a little further with Charlie Alred. Have you had any opportunity or any thoughts on this question?
MRS. ALRED: Sounds like everybody wants to convict me, that's all I know.
THE COURT: That's not the issue here.
MRS. ALRED: Well, sir, I don't know how to answer. Like I said before, this has just been sprung on me. I would like to keep Mr. Daniel.
THE COURT: Well, I know that, but . . . in spite of the conflict, in spite of the fact that he might convict you and get off Charlie?
MRS. ALRED: Well, sir, I would like to discuss it with them, too, if you would permit me.
THE COURT: Well, you are the one that you can discuss it with really anybody that you want. But I suggest to you that it's a little silly to ask Charlie Alred whether--
MRS. ALRED: Basically I would be asking Mr. Daniel.
THE COURT: But he represents Charlie.
MRS. ALRED: He represents me.
THE COURT: Well, that's the point. If he wasn't your attorney, would you ask Charlie Alred's attorney what's best for you?
MRS. ALRED: Do what now?
THE COURT: Would you ask Charlie Alred's attorney what's best for you?
MRS. ALRED: No, sir.

8

Accordingly, the district judge entered a order stating that Daniel

could represent either Irma Alred or Charlie Alred but not both.

As a result, Irma Alred and Charlie Alred each engaged different

counsel; neither retained Daniel. Charlie Alred subsequently pled

guilty and, consequently, was not Irma Alred's codefendant at

trial. In retrospect after trial and her conviction, Irma Alred now

contends that the perceived conflict at the time of the hearing was

potential, not actual, and, therefore, that Daniel should have been

permitted to represent her.

"[W]hile the right to select and be represented by one's

preferred attorney is comprehended by the Sixth Amendment, the

---

```
THE COURT: Well, that's what you would be doing when you
ask Mr. Daniel, because he's Charlie Alred's attorney?
MRS. ALRED: I would ask him on my behalf.
THE COURT: All right, I don't know if I can simplify it
any further.  I truly am just mystified. . . . I gather
. . . that neither of these two have indicated that they
have any understanding or feelings in this, the ability
to intelligently waive the potential conflict.  I think
that's the finding that I must make first as to whether
to even accept that waiver or not.  I think that's the
obligation on the Court.  And so I don't see how it's
possible that I can accept your representation of both of
these defendants.
```

R5-23, 24, 28-30 (emphasis added).

essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697 (1988). In cases of joint representation, the Federal Rules of Criminal Procedure direct that a trial judge "promptly inquire with respect to such joint representation" and "personally advise each defendant of the right to the effective assistance of counsel, including separate representation." Fed. R. Crim. P. 44(c); see Wood v. Georgia, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104 (1981) (reversing a conviction because the trial court failed to inquire into defense counsel's potential conflict of interest even though the court "should have been aware of the problem") . The danger in representing conflicting interests is not only in what an advocate does but also in what the attorney must refrain from doing at possible pretrial plea negotiations, trial, and sentencing. See Burden v. Zant, 24 F.3d 1298, 1305-06 (11th Cir. 1994).

Absent apparent good cause to believe that there is no potential conflict of interest, the trial court must take appropriate measures to protect each defendant's right to counsel. See Fed. R. Crim. P. 44(c). Although "a defendant may waive his right to the assistance of an attorney unhindered by a conflict of interests," Holloway v. Arkansas, 435 U.S. 475, 483 n.5, 98 S.Ct. 1173, 1178 n.5 (1978), "such waivers are not to be lightly or casually inferred and must be knowingly and intelligently made," United States v. Alvarez, 580 F.2d 1251, 1259 (5th Cir. 1978). Our circuit recognizes that a defendant's waiver of conflict-free counsel is constitutional when "a defendant after thorough consultation with the trial judge knowingly, intelligently and voluntarily . . . waive[s] this protection." United States v. Garcia, 517 F.2d 272, 278 (5th Cir. 1975); see United States v. Zajac, 677 F.2d 61, 63 (11th Cir. 1982) (per curiam) (recognizing that Garcia established a procedure for determining a valid waiver of conflict-free counsel). The record must show "that the defendant was

11

aware of the conflict of interest; realized the conflict could affect the defense; and knew of the right to obtain other counsel." United States v. Rodriguez, 982 F.2d 474, 477 (11th Cir. 1993) (per curiam).

Furthermore, "a district court must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." Wheat, 486 U.S. at 162, 108 S.Ct. at 1699. Therefore, district judges are "allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id. at 163, 108 S.Ct. at 1699. At the pretrial hearing devoted to determining whether Daniel could represent both Irma Alred and Charlie

Alred, the district judge was confronted with Irma Alred's desire to retain her counsel, who not only had represented a potential government witness but also who represented two codefendants with apparent conflicting interests.  It is inconsequential to our review that Charlie Alred pled guilty and did not go to trial.  We view the testimony and evidence presented to the district judge at the time of the hearing concerning the conflict of interests in Daniel's representing both Irma Alred and Charlie Alred.

Irma Alred's responses to the district judge's questions concerning the conflicting interests involved in Daniel's representing both Charlie Alred and her demonstrate that she did not understand  the potential detriment to her case if Daniel continued to represent these codefendants who clearly had conflicting interests as coconspirators and former spouses.[6] Because her answers do not show a knowing and intelligent

---

[6] In her appellate brief, Irma Alred states that she "acknowledged [to the trial judge] that she would not like it if her attorney allowed the interest of her co-defendant to override her interests."  Appellant Irma Alred's Brief at 39.

13

waiver of conflicts inherent in representing codefendants, the district judge acted within his discretion in declining to accept Irma Alred's waiver. See Wheat, 486 U.S. at 164, 108 S.Ct. at 1700. Contrary to Irma Alred's contention that the district judge disqualified Daniel from representing her, the district judge ordered that Daniel could not represent both Irma Alred and Charlie Alred, codefendants with conflicting interests. Either Irma Alred or Charlie Alred was free to continue with Daniel's representation. Instead, both chose to engage different counsel. Significantly, because Charlie Alred obtained another attorney, the district judge's order would not have precluded Irma Alred's continued representation by Daniel. At the time of the hearing concerning Daniel's joint representation of Irma Alred and Charlie Alred, however, the district judge properly acted within his discretion in declining to allow Daniel to continue to represent Irma Alred and Charlie Alred because her purported waiver of conflicting interests was not knowing and intelligent.

## 2. Use of Grand Jury Testimony

Roy Alred argues that the district judge erred in admitting the grand jury testimony of Dale Sconiers, who testified concerning the Holmes County marijuana distribution conspiracy before the grand jury the week prior to trial in this case. Because Sconiers had refused to talk to the government about his knowledge of the marijuana operation in Holmes County, he was subpoenaed to testify before the grand jury. Sconiers and Gwen Stewart appeared as witnesses before the grand jury on September 15, 1994, three days before the commencement of the trial involving Roy Alred. The government provided Roy Alred's counsel with copies of the grand jury testimony of Sconiers and Stewart the night after the second day of trial on September 20, 1994.

At the beginning of the third day of trial, Roy Alred's attorney objected to the use of the testimonies of Sconiers and Stewart and unsuccessfully moved to quash, limit or exclude the

testimonies of these two witnesses.  Roy Alred's counsel alleged that the government improperly had used the grand jury as a means of discovery against individuals who had been indicted and were going to trial the next week.  Following Sconiers's trial testimony, Roy Alred's counsel moved for a mistrial on the same grounds; the district judge denied the motion.

The grand jury investigation of the extensive marijuana distribution operation in Holmes County was ongoing.  Review of Sconiers's grand jury testimony reveals that the government's purpose in questioning him was to obtain information on the participation of Jim Alred, who was unindicted at the time of the trial involving Roy Alred.  Because Sconiers knew both Jim Alred and Roy Alred, his grand jury testimony described his knowledge of the participation of both men in the marijuana distribution operation.  Significantly, Jim Alred and others were indicted and prosecuted after the trial involving Roy Alred.

To perform its public responsibility, a grand jury has broad

investigative authority in determining whether a crime has been committed and in identifying the perpetrators.  See United States v. Calandra, 414 U.S. 338, 344, 94 S.Ct. 613, 618 (1974).  A grand jury investigation is not complete until all clues have been exhausted and every witness examined.  See id.  "[T]he law presumes, absent a strong showing to the contrary, that a grand jury acts within the legitimate scope of its authority."  United States v. R. Enters., Inc., 498 U.S. 292, 300, 111 S.Ct. 722, 728 (1991).  When it is shown that a subpoena might assist the grand jury in its investigation, the subpoena should issue, even though the prosecutor possibly will use the information procured for a purpose other than obtaining evidence for the particular grand jury investigation.  See In re Grand Jury Proceedings No. 92-4, 42 F.3d 876, 878 (4th Cir. 1994).  Although the government may not use a grand jury for discovery concerning a pending prosecution, it may continue an investigation from which information relevant to a pending prosecution "may be an incidental benefit."  United

States v. Beasley, 550 F.2d 261, 266 (5th Cir. 1977); see Beverly v. United States, 468 F.2d 732, 743 (5th Cir. 1972).

In this case, Sconiers would not talk with the government until he received his grand jury subpoena and an offer of immunity. When Roy Alred's attorney moved to exclude Sconiers's testimony, the Assistant United States Attorney explained to the district judge that the government became aware of Sconiers's information concerning Roy Alred during its investigation of the activities of Jim Alred in the Holmes County marijuana distribution operation. She explained that she did not know what Sconiers's testimony would be and that she expeditiously provided defense counsel a transcript of Sconiers's testimony regarding Roy Alred. After reviewing Sconiers's grand jury testimony, hearing his trial testimony, and considering the relevant law, the district judge determined that Jim Alred was the target of the grand jury investigation when Sconiers was subpoenaed to testify and that there was no misuse of the grand

jury process in this case that would preclude his trial testimony.[7]

We agree and conclude that the proximity in time of Sconiers's testimony before the grand jury to the trial in this case was coincidental. Because Sconiers had refused to cooperate with the government investigation of the extensive marijuana distribution operation in Holmes County until he was subpoenaed by the grand jury and received immunity, obtaining his testimony

---

[7] After hearing Sconiers's trial testimony and reviewing the relevant law, the district judge denied Roy Alred's motion to exclude Sconiers's testimony based on the following reasoning:

> With regard to the motion to exclude the testimony of Mr. Sconiers . . . based on the claim that the government had misused the grand jury process, . . . . courts may not interfere with grand juries' investigation so long as the sole and dominant purpose is to discover facts relating to other matters . . . . [There is] the presumption that the government is acting in good faith, and . . . it's the defendant's burden to prove the reason and abuse . . .[;] in the absence of clear evidence to the contrary, we presume the prosecutor acted properly in issuing the subpoena.
>     . . . .
>     Turning to the transcripts, I think it is clear that the government announced before the grand jury . . . that they were engaged in an inquiry and investigation of drug use in Holmes County. They were also engaged, specifically, from the questioning, in searching out any potential charges against [J]im Alred and any others that were involved in the conspiracy.
>     So, I . . . cannot . . . say that they have misused or abused the process. So, for that reason, the motion will be denied.

R19-636-37.

19

was delayed.  In addition to trying the case in which Roy Alred was convicted, the government continued to conduct its investigation of the extensive marijuana distribution conspiracy in Holmes County, which resulted in the indictment and prosecution of others, including Jim Alred.  Because the government did not know what Sconiers's testimony would be, it could not have known that he would describe  involvement of Roy Alred in the marijuana distribution conspiracy.  The Assistant United States Attorney promptly provided the transcript of Sconiers's grand jury testimony to defense counsel prior to his testimony at trial.

After reviewing the record in this case, we conclude that the primary purpose of Sconiers's testimony before the grand jury was to obtain information concerning Jim Alred's involvement in the marijuana distribution conspiracy as part of the government's continuing investigation of this conspiracy. Because Sconiers's testimony regarding Roy Alred was an incidental benefit of this ongoing investigation rather than a substitute for discovery, we

determine that there was no misuse of the grand jury process in using that testimony at Roy Alred's trial.  See United States v. Jenkins, 904 F.2d 549, 559 (10th Cir. 1990) (concluding that the government had not used the grand jury process as a substitute for discovery in a pending prosecution).  Roy Alred has presented no strong evidence to the contrary to cause us to deviate from our presumption that the government acted  within the scope of its authority.  See R. Enters., 498 U.S.  at 300, 111 S.Ct. at 728; Jenkins, 904 F.2d at 559-60.   Accordingly, the district judge did not err in refusing to exclude Sconiers's trial testimony concerning Roy Alred.

3. Single Conspiracy

Both Irma Alred and Roy Alred argue that the proof at trial showed the existence of multiple conspiracies and, therefore, was inconsistent with the single marijuana distribution conspiracy charged in the indictment.  Both allege that they were involved in marijuana distributions with some coconspirators but not others.

To demonstrate the multiple conspiracies, they contend that the evidence at trial revealed competition among the conspirators, particularly following  the divorce of Irma and Charlie Alred, after which different allegiances among the coconspirators developed. Irma Alred and Roy Alred represent that the possibility that the jury may have attributed to each of them marijuana distribution conspiracies in which they were not involved resulted in substantial prejudice to them and, consequently, deprived them of a fair trial.

We do not reverse convictions because a single conspiracy is charged in the indictment while multiple conspiracies may have been revealed at trial unless the variance is material and substantially prejudiced the defendants.  See United States v. Coy, 19 F.3d 629, 633 (11th Cir. 1994) (per curiam).  "A material variance between an indictment and the government's proof at trial occurs if the government proves multiple conspiracies under an indictment alleging only a single conspiracy."  United States v.

Castro, 89 F.3d 1443, 1450 (11th Cir. 1996), cert. denied, ___ U.S. ___, 117 S.Ct. 965 (1997). Because the jury determines the question of fact as to whether the evidence establishes a single conspiracy, however, the arguable existence of multiple conspiracies does not constitute a material variance from the indictment if, viewing the evidence in the light most favorable to the government, a reasonable trier of fact could have found that a single conspiracy existed beyond a reasonable doubt. See United States v. Adams, 1 F.3d 1566, 1584 (11th Cir. 1993); United States v. Reed, 980 F.2d 1568, 1581 (11th Cir. 1993). Accordingly, we will not disturb the determination of the jury that a single conspiracy exists if supported by substantial evidence. See United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997). To decide whether the jury could have found a single conspiracy, we review "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." Id.

The evidence in this case showed that the coconspirators purchased marijuana during the time that the marijuana distribution conspiracy existed from deliveries that were arranged principally by Irma Alred, who had connections for obtaining the marijuana. The record further reveals various marijuana distribution transactions in which both Irma Alred and Roy Alred participated. These transactions were substantiated by eyewitnesses, cooperating coconspirators, and tape recorded conversations. All of the participants in the conspiracy shared a common goal of distributing marijuana, which, for some, included its transportation. It is irrelevant that particular conspirators may not have known other conspirators or participated in every stage of the conspiracy; all that the government must prove to establish conspiracy liability is an agreement or common purpose to violate the law and intentional joining in this goal by the coconspirators. See United States v. Cole, 755 F.2d 748, 764 (11th Cir. 1985). "If there is one overall agreement among the various parties to

perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy." United States v. Perez, 489 F.2d 51, 62 (5th Cir. 1973).

Similarly, the various marijuana distribution transactions were virtually the same. Both Irma Alred and Roy Alred consistently participated in a distribution chain where marijuana was obtained in Texas, transported to Florida, and sold in Holmes County. Throughout the conspiracy, there was an overlap of many of the participants, particularly, Irma Alred, Roy Alred, and Charlie Alred. These facts demonstrate substantial evidence from which a reasonable jury could have concluded that a single, ongoing conspiracy existed for a period of ten years as charged in the indictment. See Calderon, 127 F.3d at 1327-28.

Our test of material variance and substantial prejudice to the defendant is stated in the conjunctive. Consequently, determining that there was no material variance because substantial evidence was presented for the jury to have found a

single conspiracy necessarily ends our inquiry into the alleged variance between the indictment and the evidence at trial. See id. at 1328. Nevertheless, we emphasize that "[v]ariance from an indictment is not always prejudicial, nor is prejudice assumed." United States v. Ard, 731 F.2d 718, 725 (11th Cir. 1984). To demonstrate substantial prejudice, Irma Alred and Roy Alred respectively would have to show that "1) that the proof at trial differed so greatly from the charges that [each] appellant was unfairly surprised and was unable to prepare an adequate defense; or 2) that there are so many defendants and separate conspiracies before the jury that there is a substantial likelihood that the jury transferred proof of one conspiracy to a defendant involved in another." Calderon, 127 F.3d at 1328 (emphasis added). Neither Irma Alred nor Roy Alred has represented that she or he was surprised by the evidence at trial. Both were well aware of most of the evidence before trial. For example, they used the tape-recorded conversations to argue that they were

competitors during the later stages of the conspiracy.

Furthermore, only five defendants went to trial in this case. Irma Alred consistently was portrayed as the original distributor with Mexico/Texas connections. She arranged to transport marijuana to the Holmes County area. Nothing in the record suggests that the jury would have been confused or misled by the evidence at trial. Additionally, we note that neither Irma Alred nor Roy Alred moved to sever her or his trial because of concern that the jury would interrelate their criminal acts.

In its case-in-chief, the government presented evidence that, while the divorce of Irma and Charlie Alred resulted in competition among some of the coconspirators during the later stages of the conspiracy, the goal of obtaining and distributing marijuana through known sources remained the same. Disagreements among participants in a conspiracy does not mean that they have not been and continued to be involved in the overall conspiracy. The conspirators in this marijuana distribution were a relatively

small and closed group, essentially Alred family members. The defense presented no evidence that either Irma Alred or Roy Alred legally withdrew from the conspiracy.[8] To the contrary, both continued to distribute marijuana from Texas until they were indicted. Even if there had been a variance between the single marijuana distribution conspiracy charged in the indictment and the evidence at trial, neither Irma Alred nor Roy Alred has demonstrated substantial prejudice to her or his case that resulted in the respective convictions; thus, any purported variance is immaterial.[9] See Calderon, 127 F.3d at 1328; United States v.

___

[8] "A conspiracy is an ongoing criminal activity for which a participant remains culpable until the conspiracy ends or the participant withdraws." United States v. Davis, 117 F.3d 459, 462 (11th Cir.), cert. denied, ___ U.S. ___, 118 S.Ct. 355, and cert. denied, ___ U.S. ___, 118 S.Ct. 395 (1997). The burden of proving withdrawal from a conspiracy is upon the defendant, who must show affirmative acts "'to defeat or disavow the purpose of the conspiracy.'" United States v. Phillips, 664 F.2d 971, 1018 (5th Cir. Unit B Dec. 1981) (quoting United States v. Wentland, 582 F.2d 1022, 1025-26 (5th Cir. 1978)). Such affirmative acts, inconsistent with the object of the conspiracy, must be communicated to the other members of the conspiracy by a means reasonably calculated to reach them. Id.

[9] This court has recognized and upheld a series of various criminal acts as comprising a single, ongoing conspiracy as charged in the indictment when the jury has so found. See Cole, 755 F.2d at 753-65 (four defendants were convicted for a single marijuana importation conspiracy involving numerous airplane deliveries from Colombia, South America, and off-loads from various vessels);

<u>Champion</u>, 813 F.2d 1154, 1168 (11th Cir. 1987). Accordingly, Irma Alred and Roy Alred's challenge to their convictions based on the alleged variance between the single conspiracy charged in the indictment and the evidence at trial is meritless.

B. <u>Sentencing Issues</u>

1. Accountable Amounts of Marijuana

Irma Alred and Roy Alred argue that the district court erred in calculating the amounts of marijuana for which they were held accountable at sentencing. Both fault the district judge for miscalculating her and his base offense level by including 1,200 pounds of marijuana that Shirley Womble testified that she and her husband, Willard, purchased from Roy Alred, who argues that this amount is inconsistent with Shirley Womble's trial testimony. Irma Alred contends that she should not be held accountable for

---

<u>United States v. Brito</u>, 721 F.2d 743, 746-48 (11th Cir.1983) (three defendants were convicted under a single conspiracy charged in the indictment for a marijuana importation conspiracy involving five smuggling ventures and nine coconspirators); <u>United States v. Solomon</u>, 686 F.2d 863, 868-71 (11th Cir. 1982) (three defendants were convicted for six thefts under a one-count indictment).

Roy Alred's marijuana transactions with the Wombles. Roy Alred additionally argues that 2,800 pounds of marijuana that he obtained from sources outside of the conspiracy in this case should not have been attributable to him.

Following separate sentencing hearings wherein these arguments were raised, the district judge determined that Irma Alred and Roy Alred each had a base offense level of 32.[10] In making this determination, the judge adopted the accountable amounts in both presentence reports ("PSRs") based on his credibility evaluation of the witnesses' testimonies used to establish the respective marijuana amounts as well as his consideration of conspiracy liability and relevant conduct. On appeal, Irma Alred and Roy Alred argue that the elimination of these disputed amounts would result in reduced base offense

---

[10] Under U.S.S.G. § 2D1.1 (1994), offenses involving at least 1,000 kilograms but less than 3,000 kilograms of marijuana have a base offense level of 32. Irma Alred's PSR states that her base offense level is 32 because her crime involved 2,899 pounds or 1,315 kilograms of marijuana. Roy Alred's PSR states that his base offense level is 32 because his crime involved 5,662 pounds or 2,568 kilograms of marijuana.

levels and, consequently, less incarceration time.

A district judge's attribution of drugs to a particular defendant under the Sentencing Guidelines is subject to clearly erroneous review. See United States v. Reese, 67 F.3d 902, 908 (11th Cir. 1995), cert. denied, 517 U.S. 1228, 116 S.Ct. 1866 (1996). Facts considered at sentencing need to be proved by only a preponderance of the evidence. See United States v. Bennett, 928 F.2d 1548, 1556 (11th Cir. 1991). In reviewing a sentence under the Sentencing Guidelines, we "give due regard to the opportunity of the district court to judge the credibility of the witnesses." 18 U.S.C. § 3742(e).

The prosecutor stated at Roy Alred's sentencing that the source of the 1,200 pounds of marijuana attributed to both Irma Alred and Roy Alred was Shirley Womble's grand jury testimony: "In her grand jury transcript, which defense counsel had at hearing and at trial, she [Shirley Womble] very clearly stated that based on her recollection it was 1200 pounds." R25-10. In filing

objections to his PSR, Roy Alred's counsel objected to other testimony attributing certain amounts of marijuana to Roy Alred, but he agreed that "as to paragraph 7 of the PSR, the Defendant respectfully submits <u>he should be held accountable for 1,200 per the Womble testimony</u>." R4-207-1 (emphasis added). On appeal, Roy Alred argues that he should not be held accountable for this 1,200 pounds of marijuana because Shirley Womble did not state that amount in her <u>trial</u> testimony. He does not represent that she did not testify as to this amount in her <u>grand jury</u> testimony. Shirley Womble was questioned about <u>individual</u> marijuana purchases at trial, while Willard Womble was asked at trial about the Wombles' <u>cumulative</u> marijuana purchases from Roy Alred during the conspiracy in this case.[11] From his perspective of

---

[11] As opposed to the 1,200 cumulative pounds of marijuana that Shirley Womble testified that the Wombles purchased from Roy Alred in her grand jury testimony, she testified about individual purchases from 1986 to 1989 at trial. <u>See, e.g.</u>, R13-7 (stating that the Wombles obtained 10 to 80 pounds of marijuana "at different times" from Roy Alred); <u>id.</u> (20 pounds); <u>id.</u> at 10 (10 pounds); <u>id.</u> at 11 (200 pounds). While Willard Womble also testified about individual purchases of marijuana from Roy Alred, <u>see, e.g.</u>, R18-169 (10 to 100 pounds at a time); <u>id.</u> (100 pounds on a few occasions); <u>id.</u> at 170 (40 pounds); <u>id.</u> at 174 (100 pounds); <u>id.</u> at 187 (10 pounds), he also responded to questions concerning

having conducted the trial in which Shirley and Willard Womble were convicted in another marijuana distribution conspiracy and their sentencings as well as the trial concerning the marijuana distribution conspiracy in this case involving Irma Alred and Roy Alred, the district judge was in the best position to make a credibility choice regarding whether Shirley or Willard Womble gave the more accurate estimate of the total amount of marijuana that they obtained from Roy Alred in this conspiracy.[12] See United

---

the cumulative pounds of marijuana that the Wombles purchased from Roy Alred, which he estimated to be between 400 and 500 pounds, see id. at 169, 189-90, based on his memory because he kept no records, see id. at 190.

[12] The prosecutor observed to the district judge at Roy Alred's sentencing that comparison of the trial testimonies of Shirley and Willard Womble revealed that "Shirley Womble is obviously a little better educated and had a better recollection of the events." R25-10. The district judge explained his decision to credit Shirley Womble's estimate of the amount of marijuana that the Wombles obtained from Roy Alred stated in her grand jury testimony as opposed to that of her husband given at trial:

> [T]he 1200 pounds having to do with the Womble matter, I do accept the testimony of Ms. Womble, having sat through trials that she was involved with, as well as having been involved in her own sentence and the determination of who did what, who was responsible, she or her husband. Do find that she's the more credible witness and has a better ability to make those estimates.

R25-15-16.

States v. Agostino, 132 F.3d 1183, 1198 (7th Cir. 1997), cert. denied, ___ U.S.___, 118 S.Ct. 1526 (1998) (recognizing that "the district court has the best perspective to judge issues of credibility" with respect to conflicts in grand jury and trial testimonies). Accordingly, we conclude that the district judge did not commit clear error by including the 1,200 pounds of marijuana that Shirley Womble testified before the grand jury was the cumulative amount that the Wombles purchased from Roy Alred during the conspiracy in this case because the district judge was in the best position to make a credibility choice between Shirley Womble's grand jury testimony and Willard Womble's trial testimony.

Irma Alred poses a different argument concerning the reason that she should not be held accountable for the 1,200 pounds of marijuana that Shirley Womble testified that Roy Alred sold to the Wombles. She contends that this amount should not be attributed to her because she was not involved in those

34

marijuana sales. To the contrary, trial testimony and evidence show that Irma and Roy were doing business together as marijuana distributors as early as 1985. Although Roy Alred had sold marijuana to the Wombles during the time that the Wombles were involved in another marijuana distribution conspiracy for which they were convicted, the 1,200 pounds that Roy sold to them that is at issue in this case was Mexican/Texas marijuana that Irma supplied to Roy.[13] We review de novo a district judge's

---

[13] The record shows that Roy Alred referred to Irma Alred as his "cousin" and "a Mexican lady," and Shirley and Willard Womble so identified her as Roy's source of supply in their testimonies at trial. See R13-23; R18-172. Thomas White, who pled guilty to the marijuana distribution conspiracy in this case and allowed Irma Alred to park vehicles containing marijuana in his barn to avoid detection, testified at trial that, during the relevant period of the conspiracy is this case, "[i]t was common knowledge" in Holmes County that Irma was involved in marijuana distribution. R19-583. At Irma Alred's sentencing, the prosecutor explained that the Wombles had two, unrelated sources of marijuana supply, Marco Polo, the conspiracy for which they were convicted, and Roy Alred, the conspiracy in this case:

> Marco Polo was another source of the Wombles. That has nothing to do with Roy Alred. And we have not attributed the Marco Polo marijuana weights that Shirley and Willard Womble were originally convicted with, we haven't attributed that in any way. It doesn't have anything to do with this case. The Wombles were buying from this individual named Marco Polo. And they were also buying from Roy Alred. . . . [T]he evidence is during this time frame that Irma and Roy had a conspiracy that was ongoing, and there was this talk about a cousin. She is a cousin or married to a cousin.

R16-16-17. The prosecutor further clarified that Irma Alred was of

relevant conduct determination under U.S.S.G. § 1B1.3 (1994). See Reese, 67 F.3d at 908. Under the amendment of section 1B1.3, which became effective on November 1, 1992, see id. at 906, and was applicable to Irma Alred and Roy Alred's sentencing proceedings on November 29, 1994, see id. at 909, Irma was "accountable for other conduct that was reasonably foreseeable and within the scope of the criminal activity that [she] agreed to undertake," id. at 907. The government proved that a small and relatively closed group of individuals known as the Alred Organization operated a marijuana distribution conspiracy from 1984 until 1994, the object of which was to bring large quantities of marijuana into Holmes County for distribution and sale. Therefore, Irma Alred was accountable for marijuana that she acquired for Roy Alred for distribution in Holmes County, as the district judge found.[14]  See United States v. Edwards, 115 F.3d

Hispanic descent and that Roy Alred referred to her as being Mexican. See id. at 15.

[14] Irma Alred argues for the first time on appeal that the district judge committed reversible error at her sentencing by

1322, 1329-30 (7th Cir. 1997) (holding that a sentencing judge's

determination that a defendant was part of a larger conspiracy

with concomitant liability deserves great deference and will be

upheld unless it is without foundation).

With respect to relevant conduct, Roy Alred additionally

---

placing the burden on her to prove that marijuana transactions between Roy Alred and Shirley and Willard Womble were not in furtherance of the conspiracy for which she and Roy Alred were convicted. Absent plain error causing manifest injustice, we will not review a sentencing argument made for the first time on appeal. See United States v. Newsome, 998 F.2d 1571, 1579 (11th Cir. 1993). Finding plain error is a three-step process: (1) error must exist, (2) the error must be obvious, and (3) it must affect substantial rights. See United States v. Chandler, 996 F.2d 1073, 1086 (11th Cir. 1993).

Irma Alred's burden-of-proof argument derives from a discussion concerning conspiracy liability between her counsel and the district judge at her sentencing. In context, the judge stated that the government had established a marijuana distribution conspiracy, "which in this case was to bring marijuana into their county and distribute it . . . . And either one [Irma Alred or Roy Alred] acting in that capacity to carry out that intent of bringing marijuana into that county to distribute it, each one is responsible for the other." R16-13. The district judge's questioning Irma Alred's counsel as to whether Irma had to demonstrate that Roy Alred's marijuana sales to the Wombles were separate from the overall conspiracy is inconsequential. Roy Alred's marijuana sales to the Wombles during the existence of this marijuana distribution conspiracy were attributable to other members of the conspiracy, including Irma Alred. While the district judge may have considered temporarily the possibility, suggested by Irma Alred's counsel, that she was not responsible for the marijuana transactions between Roy Alred and the Wombles, this theory contravenes conspiracy liability law and relevant conduct considerations required under the Sentencing Guidelines. Therefore, the district judge correctly rejected this argument and did not commit plain error in sentencing Irma Alred by holding her accountable for the marijuana involved in the sales by Roy Alred to the Wombles.

argues that he should not be held accountable for 2,800 pounds of Colombian marijuana that he obtained from sources outside of the conspirators' Mexico/Texas connections and brought to Holmes County for distribution and sale. The clarifying commentary to section 1B1.3 explains:

> With respect to offenses involving contraband (including controlled substances), the <u>defendant is accountable for all quantities of contraband with which he was directly involved</u> and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook.

U.S.S.G. § 1B1.3, comment. (n.2) (emphasis added); see <u>Stinson v. United States</u>, 508 U.S. 36, 46, 113 S.Ct. 1913, 1919 (1993) (holding that "[a]mended [Sentencing Guidelines] commentary is binding on the federal courts").

Charles Douglas Mixon, who pled guilty to being a marijuana trafficker, testified at trial that Roy Alred stored the 2,850-pound, Colombian marijuana load in Mixon's barn because Mixon marked it on his barn wall as he and Roy weighed "[e]very bale,"

and "it stayed marked on [Mixon's] barn wall for years." R6-50. At Roy Alred's sentencing, the district judge stated that he found "the Mixon testimony to be credible." R25-15. Accordingly, he held Roy Alred accountable for the 2,800 pounds of marijuana stated in his PSR.[15]

We conclude that the district judge properly included the 2,800 pounds of Colombian marijuana in the cumulative marijuana weight for which Roy was held accountable at sentencing because it constituted relevant conduct. In addition to his concurrent accountability with his coconspirators for other marijuana amounts, Roy Alred 's direct involvement with the 2,800 pounds of Colombian marijuana within the time period of the distribution conspiracy for which he was convicted in this case is

---

[15] The district judge correctly rejected Roy Alred's counsel's alternative recommendation at sentencing that, as to this load of Colombian marijuana, Roy be held accountable for the 700 pounds that he took away in his car because Roy was involved with the handling and weighing of the entire marijuana load. We further note that the difference in 2,850 pounds of marijuana that Mixon testified was the weight of this load of Colombian marijuana and the 2,800 pounds for which Roy Alred was held accountable at sentencing would not have been sufficient to increase his base offense level beyond 32.

attributable to him as relevant conduct.  See U.S.S.G. § 1B1.3, comment. (n.2).  Having determined  that Irma Alred and Roy Alred properly were held accountable for the 1,200 pounds of marijuana that Roy sold to the Wombles and that Roy was accountable for the 2,800 pounds of Colombian marijuana, we uphold their respective  base offense levels of 32 as calculated by the district judge.

2. Enhancement for Possession of Firearms

Roy Alred  contests  his enhancement  for possession  of firearms and argues that the trial evidence does not support a finding that he possessed or reasonably could have foreseen possession of firearms by others in furtherance of the marijuana distribution conspiracy.  The Sentencing Guidelines require that a two-level enhancement be applied to the base offense level for a convicted defendant for a drug crime "[i]f a dangerous weapon (including a firearm) was possessed."  U.S.S.G. § 2D1.1(b)(1). The weapon possession enhancement reflects the increased

likelihood of violence associated with the possession of firearms by drug traffickers. Id. comment. (n.3). A sentence enhancement based on a coconspirator's firearm possession is permitted if "(1) the firearm possessor was charged as a coconspirator; (2) the coconspirator possessed the firearm in furtherance of the conspiracy; and (3) the coconspirator who is to receive the sentence enhancement was a member of the conspiracy at the time that his conconspirator possessed the firearm." United States v. Gates, 967 F.2d 497, 500 (11th Cir. 1992) (per curiam). The government has the burden of establishing the appropriateness of the enhancement by a preponderance of the evidence. Id. at 500-01. Actual knowledge of the coconspirator's firearm possession by the convicted defendant is not required for the enhancement to apply, but possession must be reasonably foreseeable. See United States v. Martinez, 924 F.2d 209, 210-11 & n.1 (11th Cir. 1991) (per curiam). Additionally, we have held that "the enhancement is to be applied whenever a firearm is

41

possessed during conduct relevant to the offense of conviction."

United States v. Smith, 127 F.3d 1388, 1390 (11th Cir. 1997) (per curiam). We review a district judge's factual findings used to determine the applicability of a section 2D1.1(b)(1) enhancement for clear error. See United States v. Pessefal, 27 F.3d 511, 515 (11th Cir. 1994).

At trial, Charles Douglas Mixon, who pled guilty to being a marijuana trafficker, testified that guns were prevalent during a 600 to 700-pound marijuana transaction:

> Roy had a -- if we had went off, it would've blew up half of that field. Like I say, it wasn't only Roy. I had guns, you know, laying everywhere. And Alan, he had an automatic weapon. It was more or less just all in our head 'cause we was doing cocaine and everything else, and we just thought everybody was after us. And Roy stood in the pouring rain and watched the road like the National Guard was going to come in there on us. But, like I say, there was guns everywhere, everywhere.

R17-29. In addition to Roy Alred's possessing firearms when he participated in the marijuana distribution conspiracy during the

relevant time period,[16] the district judge correctly determined that possession of firearms by Roy Alred's coconspirators also made this enhancement applicable to him.[17] We conclude that the facts that the district judge used as the basis for the section 2D1.1(b)(1) enhancement were not clearly erroneous. Thus, Roy Alred's enhancement for possession of firearms was appropriate.

### 3. Enhancement for Leadership Role

---

[16] On appeal, Roy Alred complains that he has been held accountable for two pistols that he had in his possession at the time of his arrest on the indictment as opposed to the time during his active involvement in the marijuana distribution conspiracy crime. His attorney explained at sentencing that Roy Alred lawfully owned these guns and that they were returned to him by United States Customs. He further explained that Roy Alred had the guns in connection with his road travel as a contractor and that these guns had not been related to any drug offense. Disregarding these two firearms, we find that there is sufficient evidence of Roy Alred's personal possession of firearms in connection with his active participation during the marijuana distribution conspiracy for which he was convicted to warrant the § 2D1.1(b)(1)enhancement.

[17] At Roy Alred's sentencing, the district judge explained that he based the § 2D1.1(b)(1) enhancement not only on Roy Alred's personal possession of firearms during the conspiracy but also on the reasonable foreseeability of coconspirators' possessing weapons in connection with their marijuana distribution conspiracy:

> Well, I do find that based upon the testimony of the defendant having used guns in the drug arena would demonstrate that he had reasonable foreseeability of others who are engaged in that activity to possess guns. And I do find the time frame, as my notes would reveal, that he was involved in the drug conspiracy. And, therefore, it is attributable to him regardless.

R25-24.

43

Roy Alred argues that the district judge should not have enhanced his base offense level by four levels under U.S.S.G. § 3B1.1(a) for a leadership role in the marijuana distribution conspiracy in Holmes County. He contends that he had only a buyer/seller relationship with his coconspirators in marijuana transactions for which a section 3B1.1(a) enhancement is inapplicable. We agree.

A sentencing judge is authorized to apply a four-level enhancement to the base offense level of a convicted defendant who "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). We have determined that the plain language of section 3B1.1(a) "requires both a leadership role and an extensive operation. Without proof of the defendant's leadership role, evidence of the operation's extensiveness is insufficient as a matter of law to warrant the adjustment." United States v. Yates, 990 F.2d 1179, 1181-82 (11th Cir. 1993) (per curiam). The

44

factors that the district judge should consider "[i]n distinguishing a leadership  and organizational role from one of mere management or supervision" are

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. . . .  This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, comment. (n.4).   The government must prove the existence of an aggravating role by a preponderance of the evidence.  See Yates, 990 F.2d  at 1182.  The district judge's determination of a convicted defendant's role in the offense is a factual finding subject to clearly erroneous review, but the application of a guideline to a particular factual situation is a question of law that we review  de novo.  See id.

Although the government presented evidence at trial that Roy Alred sold marijuana to a number of individuals, there was

45

little indication that he actively recruited buyers or directed their activities. For example, Collis Hobby and Dale Sconiers testified that they initiated contact with Roy Alred. Hobby testified that a relatively small portion of his marijuana transactions were with Roy Alred, whom he considered to be an individual buyer/seller.

Similarly, Shirley and Willard Womble as well as Robert Earl Tucker testified that they purchased marijuana from Roy Alred only after he had purchased marijuana from them. Like Hobby, the Wombles bought most of their marijuana from another source and were in business for themselves. Tucker also had other sources of supply and was in a partnership with a third individual, both of whom operated independently of Roy Alred, who did not know Tucker's partner and generally did not know to whom Tucker resold marijuana that he had purchased.

The trial evidence further showed that Jesus Galaviz and Antonio Martinez delivered and/or attempted to deliver large loads of marijuana to Roy Alred in 1993. They were hired and paid,

however, by the seller, an individual from Houston, Texas. Likewise, Jose Cuellar delivered marijuana to Roy Alred but worked under the direction of others.

Only slight evidence indicates that Roy Alred may have recruited or directed the actions of his coconspirators. In 1990, a Louisiana State Trooper stopped Roy Alred as he and his nephew traveled to Houston with $21,000 in cash. Additionally, Sconiers testified that Roy Alred and his cousin Jim Alred used Sconiers's property to off-load four or five truck loads of marijuana in the early 1990's. Although Willard Womble initially recruited Roy Alred to purchase marijuana from him, Womble testified that, nine to twelve months after that transaction, Roy Alred came to his home and "[w]e got to talking. The next thing, I agreed to buy marijuana." R18-169.

Three witnesses to whom Roy Alred sold marijuana testified that he "fronted" the marijuana to them. Hobby testified that at least one of his purchases from Roy Alred was fronted. On that

47

occasion, he received the marijuana on credit and paid for it a few days later after he resold it. Shirley Womble also testified that once she delivered money to Roy Alred with the implication that it was in payment for marijuana previously received. Like Hobby, Sconiers testified that his purchases were fronted or made on credit.

Over objection from Roy Alred's counsel, the district judge determined that "the four level increase is appropriate under the evidence presented in this case." R25-27. We have held that a convicted defendant's status as a middleman or distributor is insufficient for a section 3B1.1 enhancement, which requires authority in the organization that perpetrates the criminal conduct, the exertion of control, or leadership. See Yates, 990 F.2d at 1182; accord Maxwell, 34 F.3d at 1012 (determining that a seller/buyer relationship is inappropriate for a section 3B1.1(a) enhancement). We further have concluded that arrangements between buyers and sellers, such as negotiating deliveries, are

48

"simply incidental to the buyer-seller relationship."  United States

v. Witek, 61 F.3d 819, 823 (11th Cir. 1995), cert. denied, ___ U.S.

___, 116 S.Ct. 738 (1996).   In a continuing criminal enterprise,

we  have  held  that  "evidence  of  fronting,  without  more,  is

insufficient to satisfy the management requirement."[18]  Id. at 824.

---

[18]  Similar  to  U.S.S.G.  §  3B1.1(a),  participation  in  a continuing criminal enterprise requires the government to show that the defendant "occupies a position of organizer, a supervisory position, or any other position of management" with respect to five other persons involved in unlawful drug trade.   21 U.S.C. § 848(c)(2)(A).  Additionally, we recognize that Witek and our decision in this case may appear to be inconsistent with United States v. Howard, 923 F.2d 1500 (11th Cir. 1991), which we distinguish factually.  In Howard, the fronting or credit purchase of cocaine involved direct control by the convicted defendant. That is, the defendant-appellant, Ed Howard, provided cocaine to a purchaser, Eric Hall,"without requiring immediate payment upon delivery.  Howard then accompanied Hall to the location where Hall sold the cocaine to a third party, and upon completion of the sale, Hall then turned the money over to Howard in payment for the cocaine."  Howard, 923 F.2d at 1502.  This court found that Howard "exercised a managerial role" in fronting the purchase of the cocaine to Hall and affirmed the district judge's according Howard a three-level enhancement under § 3B1.1(b) for acting as a manager or supervisor in the criminal conduct because the factual findings upon which the enhancement was based were not clearly erroneous. Id. at 1503.
     In this case, however, the fronting participation by Roy Alred was more removed and attenuated.  For example, Mixon  testified that he did not pay Irma Alred for 200 pounds of marijuana driven in a rental car by Roy Alred from Texas and delivered by him until one to two weeks after delivery.  R17-26.  Given Roy Alred's delegated role as a transporter and deliverer of marijuana rather than as a collector of payment, it was clearly erroneous for the district judge to enhance Roy Alred's base offense level by the greatest enhancement of four levels for having a leadership role under § 3B1.1(a) for fronting on the facts of this case. Roy Alred's participation in the Holmes County marijuana distribution conspiracy was the antithesis of a leadership role; rather, he was directed and instructed by those who did have controlling roles.

We conclude that the evidence presented by the government in this case of Roy Alred's buyer/seller and fronting relationships is insufficient to support his four-level enhancement under section 3B1.1(a) for having a leadership role in the marijuana distribution conspiracy in Holmes County. The district judge improperly applied this four-level adjustment to Roy Alred's base offense level. On remand, the district judge will resentence him without the section 3B1.1(a) enhancement.

## III. CONCLUSION

In this appeal, Irma Alred and Roy Alred challenge their convictions and sentences for conspiracy to distribute marijuana in Holmes County. As we have explained, we AFFIRM their convictions and Irma Alred's sentence. We VACATE Roy Alred's sentence because the district judge improperly gave him a four-level enhancement in his base offense level for having a leadership role in the marijuana distribution conspiracy. Accordingly, we REMAND to the district court to resentence Roy

Alred without the four-level enhancement under section 3B1.1(a).