[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12554
Non-Argument Calendar

_____

D.C. Docket No. 6:11-cr-00295-JA-KRS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CHI TAM DANG,
a.k.a. Tam Dang,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 28, 2013)

Before CARNES, HULL and JORDAN, Circuit Judges.

PER CURIAM:

Chi Tam Dang appeals his 87-month prison sentence imposed after he

pleaded guilty to conspiracy to distribute and possess with intent to distribute more

than 100 kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(vii) and 846.  At his sentencing, Dang was assigned a four-level aggravating role enhancement under U.S.S.G. § 3B1.1(a) because he was an organizer or leader in criminal activity that involved five or more participants. Dang contends that the district court clearly erred by imposing that enhancement. He also argues that the district court misunderstood the law and erroneously concluded that it could not grant a downward variance from the advisory sentencing range based on the public policy argument that sixteen states had legalized medical marijuana.

## I.

Dang, who lived in California, had a medical marijuana card for the treatment of back pain and insomnia.  Evidence produced at sentencing showed that Dang mailed packages of marijuana from California to at least six different people in Florida.[1]  Those people then forwarded the packages to Arlonzo Moore for further distribution, and Moore sent the proceeds to Dang in California.  There was no evidence that Dang was in direct contact with any of the people who received the drugs in Florida.  Dang also sold drugs to Anthony Norris; originally Dang supplied Norris through Moore, but when Norris began requesting greater quantities than Moore could provide, Dang began supplying Norris directly.  In

---

[1] Those people pleaded guilty to conspiracy to distribute marijuana in separate but related cases.

2

California, investigators observed Dang traveling to and from the post office with three other people (who were not indicted). Sometimes Dang mailed the packages; sometimes one of the others did.

Moore told Dang where to ship the drugs, and Dang fronted him the drugs. Moore made a profit of between $500 and $1,000 per pound. Dang charged Moore between $4,500 and $5,000 per pound of marijuana. Dang told Moore how and where to deposit payment for the drugs to avoid arousing suspicion at the bank. Cash deposits were usually made into Dang's bank accounts. Sometimes money was deposited into the accounts of his three confederates in California. The deposits made into Dang's or the others' accounts were withdrawn on the same day or soon thereafter. On a few occasions, Dang instructed Moore to fly to California with the cash payment. Over the course of Dang's dealings with Moore and Norris, roughly $1.5 million was deposited directly into Dang's accounts. Investigators did not discover who withdrew the deposits on every occasion, but they did find that some money withdrawn from others' accounts was wire transferred into Dang's accounts. They also observed Dang withdrawing the money from his own account on several occasions. The proceeds of the drug sales have not been located.

Dang was otherwise unemployed and apparently supported himself and his girlfriend with the drug proceeds. He lived a modest life, renting a duplex and

3

driving an old car, which led one investigator to testify at the sentencing hearing that Dang was "probably accountable to somebody else as well where he had to pay money." Dang, however, never said anyone was directing his involvement in the drug conspiracy.

## II.

Dang argues that he should not be subject to the four-level enhancement under § 3B1.1(a) because the evidence does not show that he was a leader. The government has the burden of establishing the applicability of a guidelines enhancement by a preponderance of the evidence. United States v. Cataldo, 171 F.3d 1316, 1321 (11th Cir. 1999). A defendant's role as an organizer or leader is a factual finding that we review only for clear error to determine if the enhancement under § 3B1.1 was applied appropriately. United States v. Ramirez, 426 F.3d 1344, 1355 (11th Cir. 2005); see also United States v. Martinez, 584 F.3d 1022, 1025 (11th Cir. 2009) ("We review a district court's determination that a defendant is subject to a Section 3B1.1 role enhancement as an organizer or leader for clear error."). When reviewing for clear error, we will reverse only if we are "left with the definite and firm conviction that a mistake has been committed" and not "simply because we would have decided the case differently." Easley v. Cromartie, 532 U.S. 234, 242, 121 S.Ct. 1452, 1458 (2001) (quotation marks omitted).

4

Section 3B1.1(a) provides a four-level sentencing enhancement if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Factors that should be considered in determining if a defendant was an organizer or leader include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, cmt. n.4. There can be "more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." Id.

This is a close case, as the district court acknowledged at sentencing, saying: "The argument is a good one that [Dang] has made at first blush, because, really, with regard to the relationship—Mr. Dang's relationship with Mr. Moore's minions, there was none. And it wasn't an intensely managed hands-on management of the organization here in Florida. . . . [But] it's inescapable that [Dang] was directing Mr. Moore and others in an organization that I've already found involved more than five people or more and was otherwise extensive."

The court found that Dang directed Moore because Dang told him what to do with the proceeds from the drug sales and fronted him the drugs. The fact that

5

Dang controlled the drugs and gave instructions regarding payment for those drugs alone is not enough to show that he was a leader. See Martinez, 584 F.3d at 1028 ("[M]erely distributing drugs and making arrangements for the delivery and sale of drugs between the buyer and seller is not enough to demonstrate a leadership role under Section 3B1.1(a)."). And evidence of fronting, without more, does not establish that the defendant was a leader. United States v. Alred, 144 F.3d 1405, 1422 (11th Cir. 1998). In this case, however, evidence presented by the government indicated that Dang exercised more control in the operation than a typical seller. The district court heard testimony that Dang both fronted Moore drugs and told Moore how to deliver the proceeds from the drug sales. On several occasions, he even directed Moore to carry the cash to him on flights to California. (Moore was stopped at the airport during one of those trips carrying $30,000.) Dang also began to deal directly with Norris when Moore could not supply the amount of marijuana Norris needed.

The district court also specifically found that Dang was directing the three people with whom he was seen traveling and mailing packages in California. Although there is no direct evidence that Dang gave orders to those people, there is evidence that he used their bank accounts to process the proceeds of the drugs and evidence that by mailing some of the packages they participated in the drug sales

6

that Dang arranged with Moore.  Based on all of the evidence, it was not clear error for the court to conclude that Dang directed the three people in California.

The court also considered the fact that Dang controlled a large portion of the proceeds from the operation, finding that Dang "received and either kept or withdrew from checking accounts a sum of money far disproportionate to that that anybody else in this organization had."  Exercising control over some of the profits from the enterprise does not by itself establish a leadership role.  See Martinez, 584 F.3d at 1028 (finding that the fact that the defendant was involved in the wire transfer of roughly half of the proceeds as insufficient to prove a leadership role).  In this case, however, the government also presented evidence that at least $1.5 million was deposited in Dang's accounts and he withdrew that money.  Although the investigators were not able to find the ultimate destination of the money, Dang was the final person known to exercise control over the money.  And he has not named anyone who was directing him.  We might have found differently if we were the fact finder, but we are not "left with the definite and firm conviction" that it was a mistake for the district court to find that Dang was a leader.

### III.

Dang also argues that the district court erred by failing to consider granting a downward variance from his guidelines range based on the nationwide debate concerning medical marijuana.  We review sentences—whether inside or outside

7

of the guidelines range—for an abuse of discretion.  Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007).  Where possible, we interpret the district court's ambiguous oral statements to be consistent with the law.  See Cataldo, 171 F.3d at 1319 n.6 ("[W]e do not assume that the district judges do not know the law: their ambiguous oral statements, if possible, are interpreted to be consistent with (and not inconsistent with) the law.").

Dang argues that the district court's assertion, "[M]y views on such things [the medicinal use of marijuana] don't control my decisions.  The law controls my decisions as best I can understand, and I understand my mandate under the law," shows that the court incorrectly believed that it could not grant a downward variance, and consequently did not consider his argument that he should be granted one, based on the national public policy debates about the legality of marijuana and medical marijuana.

We do not consider whether the court would have been permitted to grant a downward variance based on the public policy debates about marijuana because Dang's underlying contention—that the district court failed to consider his argument—is untrue.  Shortly before making the statement highlighted by Dang, the court responded to his request for a downward variance based on California's policy allowing medicinal use of marijuana by saying: "I can conceive of an argument if somebody was using medical marijuana for a medical purpose in

8

Florida that I should take into account that in other states it's legal; but that's not what I have here.  It's not a use question.  It's a sale question."  The court's statements show that it considered and rejected Dang's argument.  And we will not construe the court's statement that it follows the law as evidence that it does not understand the law.  Therefore, Dang has not shown that the district court abused its discretion in rejecting his request for a downward variance.  The district court did not err by rejecting Dang's request for a downward variance.

**AFFIRMED**.