UNITED STATES of America,
Plaintiff–Appellee,

v.

Andrew Newman JONES, David D.
Hodge, Andrew Zweigbaum,
Defendants–Appellants.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Tammy Kay HUSKIN,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Jerome Michael SIEGEL,
Defendant–Appellant.

Nos. 90–8338, 90–8481 and 90–8497.

United States Court of Appeals,
Eleventh Circuit.

June 19, 1991.

Patrick G. Longhi, Atlanta, Ga., for Hodge.

Donald A. Lykkbak, Orlando, Fla., for Zweigbaum.

Teresa Wynn Roseborough, Sutherland, Asbill & Brennan, Atlanta, Ga., for Huskin.

Catherine B. Lerow, Atlanta, Ga., for Siegel.

James W. Kesler, U.S. Attorney's Office, Southeastern Drug Task Force, Atlanta, Ga., for the U.S.

Before HATCHETT, CLARK and DUBINA, Circuit Judges.

HATCHETT, Circuit Judge:

In this multiple defendant marijuana importation case, we affirm the convictions and sentences.

## FACTS

In mid–1988, Marcel Grasso met Tammy Huskin and they discussed importing marijuana from Jamaica to Florida. Huskin and Mark Mayer, Grasso's "money man," later traveled to Jamaica where Huskin introduced Mayer to Jerome Siegel and told Mayer that Siegel could supply marijuana as well as a landing area in Jamaica. Mayer also met Norris Nembhard, the source for the marijuana. Eventually, Mayer and Siegel agreed that Siegel would provide marijuana and Mayer would pick it up and transport it to Florida by sailboat.

Andrew Jones gave Grasso $15,000 to help purchase the sailboat in return for one-third of the profits. Siegel then traveled to Florida to inspect the sailboat so that Siegel could determine how much marijuana the vessel could carry. Later, Grasso asked Andrew Zweigbaum for money because the sailboat had blown an engine. Zweigbaum gave Grasso $6,500 in return for a portion of the marijuana to be imported.

William N. Decarlis, Gainesville, Fla., for Jones.

In late 1988, after experiencing numerous problems with the sailboat, Grasso and

Mayer decided to find an airplane and a pilot to fly the marijuana to Florida. In December, 1988, Larry Martin received a telephone call from Huskin. Huskin, who was unaware that Martin was cooperating with United States Customs agents in Georgia, told Martin that he would be hearing from Grasso about smuggling marijuana. Grasso later told Martin about Grasso's plans to import marijuana from Jamaica to Florida.

On December 28, 1988, Martin met Grasso in Atlanta, Georgia. They agreed that Martin would supply a pilot and an airplane to import the marijuana. On January 5, 1989, Grasso and Mayer met with Martin and an undercover Georgia Bureau of Investigations (GBI) agent posing as a pilot. While Mayer and the agent discussed details of the operation, Grasso and Martin talked of paying Huskin money for her services in directing Grasso and Mayer to Martin. Later, at William Nash's house, Grasso introduced Nash to the GBI pilot and stated that Nash would be a member of the off-load crew.

While Grasso and Huskin were meeting with Martin to arrange transportation for the marijuana, Jones, at Grasso's request, was attempting to do the same thing with different people. Through Robert Lillard, an acquaintance of Jones, Jones eventually contacted Kevin Phillips, hoping Phillips could act as the pilot. Unknown to Jones, Lillard was helping law enforcement officials and Phillips was an undercover U.S. Customs agent. Jones told Lillard that Jones's effort to locate an airplane and a pilot was not his only role in the smuggling venture. Jones stated that he had arranged for the marijuana to be flown into a 14,000–acre ranch, the Flying "P," which borders the Dunnellon Municipal Airport near Ocala, Florida, and that "everything was taken care of" regarding the ranch.

On January 3, 1989, Jones, Grasso, and Nash drove to the Flying "P" and met with David Hodge, an employee of the Flying "P." Jones had earlier introduced Grasso to Hodge, and had told Grasso that Hodge would make sure the landing area was clear and the gates were open so that the off-load vehicles could enter and exit the ranch without suspicion. The men drove through the ranch to get an idea of where the airplane could land.

Two days later, Grasso and Mayer decided to use the GBI pilot, rather than Phillips, to transport the marijuana. Jones then contacted Mike Dobbs and offered Dobbs the chance to earn some easy money by unloading "bales" from an airplane. Jones told Dobbs that Grasso was involved in this venture. Dobbs also overheard Jones and Hodge discussing the landing of an airplane near the Flying "P" and the need for lights for a runway. At the end of January, Jones sent Dobbs to meet with Grasso, Nash, and Hodge near the ranch. After this meeting, Dobbs called Jones and told him that he wanted nothing to do with the smuggling venture. Jones urged Dobbs to stay involved.

On January 26, 1989, the GBI pilot met Mayer and Siegel at Siegel's residence in Montego Bay, Jamaica. During this trip, Siegel provided all the necessary logistical details of the smuggling operation. Shortly thereafter, Mayer told Zweigbaum that a load of marijuana was due in soon and they agreed that Mayer would "front end" Zweigbaum up to 500 pounds of this marijuana. Mayer asked Zweigbaum if he could use Zweigbaum's Chevrolet Blazer to transport Zweigbaum's share directly to him. Zweigbaum agreed and Mayer later took the Blazer to the Flying "P" February 2, 1989, the day the airplane was scheduled to arrive with the marijuana.

On February 2, 1989, the GBI pilot picked up 866 pounds of marijuana in Jamaica and flew to a small airport in Henry County, Georgia. Government agents told Grasso and Mayer to come pick up the load. When Mayer arrived, law enforcement agents arrested him and later arrested Grasso, Nash, and the appellants (Hodge, Huskin, Jones, Siegel, and Zweigbaum).

## PROCEDURAL HISTORY

On August 16, 1989, a superseding indictment charged Hodge, Huskin, Jones, Siegel, and Zweigbaum with their involvement in the importation scheme. Prior to

the return of the superseding indictment, Grasso, Mayer and Nash entered guilty pleas to charges in the original indictment and agreed to cooperate with the government's ongoing investigation. Siegel and Huskin each pleaded guilty to one count of conspiracy to import marijuana in violation of 21 U.S.C. § 963. A jury convicted Hodge, Jones, and Zweigbaum of the same charge. The jury also convicted Jones of importation of marijuana in violation of 21 U.S.C. §§ 952, 960, and convicted Zweigbaum of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841.

## CONTENTIONS

Zweigbaum and Jones contend that the district court erred in refusing to give jury instructions relating their theories of defense.

Hodge contends that the district court erred in admitting evidence concerning the sequence of events leading up to the importation conspiracy, and that the evidence is insufficient to support his conviction.

Siegel contends that the district court erred in imposing a three-level increase under the Sentencing Guidelines for Siegel's role in the offense.

Huskin contends that the government's failure to make a substantial assistance motion at Huskin's sentencing hearing violated the terms of her plea agreement. Huskin also contends that the district court can impose a sentence below the statutory minimum if it finds the government has refused in bad faith to make a substantial assistance motion. Finally, Huskin contends that the procedures by which she was sentenced violate her fifth and eighth amendment rights.

The government contends that the district court ruled properly and that the appellants' convictions and sentences should be affirmed.

## ISSUES

The issues are: (1) whether the district court erred in refusing to give certain requested jury instructions; (2) whether the district court erred in admitting extrinsic act evidence; (3) whether the evidence is sufficient to sustain Hodge's conviction for conspiracy to import marijuana; (4) whether the district court erred in imposing a three-level increase to Siegel's offense level; (5) whether the district court erred in declining to grant a reduction for substantial assistance to Huskin's sentence; (6) whether the government breached Huskin's plea agreement; and (7) whether the length of Huskin's sentence or the provisions of Title 18 U.S.C. § 3553(e) violates Huskin's fifth or eighth amendment rights.

## DISCUSSION

### I. Proposed Jury Instructions

■ A district court's refusal to give a requested instruction warrants reversal only if the requested instruction was correct, the charge actually given did not substantially address it, and the failure to give the instruction seriously impaired the defendant's ability to present an effective defense. *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 789, 88 L.Ed.2d 767 (1986).

■ Zweigbaum argues that his requested jury instruction explained that his theory of defense was that specific government witnesses lied, and that the district court's failure to relate Zweigbaum's theory of defense seriously impaired his ability to effectively argue his case. According to Zweigbaum, sufficient evidence relevant to the defense was adduced at trial such that the district court should not have refused the requested charge.

After reviewing the record, we find that the charge given to the jury adequately covered the substance of Zweigbaum's requested instruction. The district court repeatedly advised the jury that it did not have to accept all of the testimony before it as being true and accurate, and that certain testimony should be considered with caution and weighed with great care. Even if the charge given did not adequately cover the proffered instruction, when the trial testimony, the court's charge, and

Zweigbaum's closing argument are taken together, the failure to give the requested instruction did not seriously impair Zweigbaum's ability to present an effective defense.

■ Jones argues that his membership in the conspiracy was conditioned upon his providing a pilot who would be used to fly the marijuana into the United States. According to Jones, because he failed to satisfy this condition precedent, he could not become part of the conspiracy. Jones contends that in light of such evidence, he was entitled to jury instructions which stressed that to support a conviction, the individuals involved must come to a firm agreement which is mutually acceptable, and that if the communications do not develop into the firm agreement, then a conspiracy cannot be found. According to Jones, the jury instruction given "that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan as charged in the indictment" did not adequately inform the jury as to his theory of defense and interfered with his ability to defend himself. Jones argues that in the jury's mind the "mutual understanding" sufficient to support the conspiracy charge could be the understanding that if Jones obtained the pilot that would be used, he could then be a part of the smuggling operation, or it could be the general intent to further the smuggling operation.

Nevertheless, a reasonable jury could not have found from the evidence presented at trial that a specific precondition had to be satisfied before Jones would be admitted into the smuggling conspiracy. Jones's involvement went considerably beyond a mere attempt to acquire a pilot and an airplane. Even after Mayer and Grasso opted to use the GBI pilot, Jones continued his participation. Jones evinced knowledge of where and when the smugglers expected the marijuana to arrive in the United States. Jones actively recruited Hodge and Dobbs and subsequently instructed them on how they should prepare for the actual importation. These actions are consistent with the conclusion that Jones had a firm agreement with Grasso to assist in the importation of marijuana regardless of Jones's ability to provide a pilot. Moreover, the court's instructions adequately covered Jones's theory of defense, and Jones had ample opportunity to present that defense.

## II. Extrinsic Act Evidence

■ At trial, defense counsel objected to the admission of evidence concerning the plans to import the marijuana by sailboat on the grounds that it "could prove to be prejudicial and not admissible under [Federal Rule of Evidence] 404(b) and definitely excludable under [Federal Rule of Evidence] 403."[1] Hodge argues that the government could not prove that Hodge knew of or in any way participated in the sailboat conspiracy. According to Hodge, that conspiracy is distinct from the conspiracy charged in his indictment, and the district court erred in admitting this evidence because the jury could likely have transferred the evidence from the earlier conspiracy to the later one.

We review the district court's decision to admit extrinsic act evidence under a clear abuse of discretion standard. *United States v. Eirin,* 778 F.2d 722, 731 (11th Cir.1985).

In admitting evidence of extrinsic acts, the evidence must be relevant to an issue other than the defendant's character. Further, the evidence must meet the rule 403 requirements. *United States v. Beechum,*

---

1. Rule 404(b) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

   (West 1991). Rule 403 provides in part:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury....
   (West 1991).

582 F.2d 898, 911 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).[2] The evidence relating to the earlier importation scheme is relevant on the issues of motive and intent as to Jones and Zweigbaum. The evidence is also probative to explain the relationship between those two men and Mayer, Grasso, and Nash. Moreover, Hodge has not shown how the admission prejudiced him because Hodge was not involved in the aborted scheme, nor did the government even attempt to so suggest. The district court did not abuse its discretion in admitting evidence of the earlier importation conspiracy.

### III. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence, we examine the evidence in the light most favorable to the government. *United States v. Greer,* 850 F.2d 1447, 1450 (11th Cir.1988). The verdict will be upheld provided a reasonable person could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Migueles,* 856 F.2d 117, 118 (11th Cir.1988).

■ To convict Hodge of conspiracy, the government must prove that the conspiracy existed, that Hodge knew of the agreement, and that Hodge voluntarily joined the agreement. *United States v. Sullivan,* 763 F.2d 1215, 1218 (11th Cir.1985). We find the evidence against Hodge to be more than sufficient. Hodge knew he would receive $5,000 in return for helping Grasso and others gain easy access to the Flying "P" Ranch. Hodge led Grasso, Nash, and Jones on a tour of the property in order to get an idea as to where an airplane could land. Finally, Grasso and Hodge were at the ranch together February 2, 1989, in order to meet and unload the airplane arriving from Jamaica.

### IV. Role in the Offense

■ During the sentencing hearing, Siegel did not object to the factual presentation in the presentence report, as modified by the addendum; instead, Siegel challenged the report's recommendation of a three-level increase for Siegel's role as a "manager or supervisor" in the offense pursuant to Sentencing Guidelines section 3B1.1(b). The district court enhanced Siegel's offense level by three levels because of Siegel's role in the offense. Siegel now argues that the district court erred in adopting the findings of the presentence report and in overruling Siegel's objections without comment. Siegel also contends that his offense level should be decreased because he was a minor participant in the offense.

To facilitate our review of sentencing decisions, district courts should make explicit findings of fact and conclusions of law. *United States v. Wise,* 881 F.2d 970, 973 (11th Cir.1989). Although the district court summarily denied Siegel's objection concerning his role in the offense, that action does not "preclude meaningful appellate review," because the factual presentation in the presentence report, as modified by its addendum, was not reasonably in dispute. *Wise,* 881 F.2d at 973.

We review the district court's factual determination of Siegel's role in the offense under a clearly erroneous standard of review. *United States v. Carrillo,* 888 F.2d 117, 118 (11th Cir.1989). Siegel asserts that he was merely an interpreter for and a subordinate to Nembhard, the actual marijuana supplier. Siegel argues that except for the details to which Nembhard requested Siegel attend, Siegel lacked knowledge of the scope and structure of the enterprise. Siegel also argues that in order for him to be regarded as a manager or supervisor, the commentary background to section 3B1.1 requires that he intended to profit more from the commission of the offense than other participants and was a greater danger to the public and/or was more likely to be a recidivist. According to Siegel, these standards were not met.

We affirm the district court's enhancement. Siegel's subordinate role to

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

Nembhard does not absolve Siegel of the supervisory role he played in coordinating and managing the delivery and transportation of the marijuana from Jamaica into the United States. During his trips to the United States, Siegel helped Mayer, Grasso, and the GBI pilot plan the operational aspects of the smuggling effort. Siegel made unilateral decisions regarding landing and loading locations and the timing of such trips. The extent of Siegel's involvement both in the United States and in Jamaica demonstrates that Siegel had the responsibility of ensuring that the contemplated smuggling venture would succeed.

Siegel's contention concerning the commentary background of section 3B1.1 is meritless and based on a misreading of the language. Finally, the district court did not err in finding that Siegel should not have been classified as a minor participant for his role in the offense. *See* U.S.S.G. § 3B1.2, comment. (Nov. 1, 1990). The record amply supports the conclusion that Siegel's criminal culpability was not less than most other participants.

## V. Substantial Assistance

Huskin's conviction for conspiracy to import marijuana in violation of 21 U.S.C. § 963 subjected her to a statutory minimum sentence of five years imprisonment. 21 U.S.C.A. § 960(b)(2) (West Supp.1991). Nevertheless, "[u]pon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C.A. § 3553(e) (West Supp.1991). During Huskin's sentencing hearing, the district court inquired if the government intended to make such a motion. The prosecution replied that though Huskin had made the effort to be debriefed, she had not provided "substantial assistance," so the motion could not be made.

Huskin first argues that because the government made the motion for other defendants but not for Huskin, and because the government admitted that Huskin helped in certain matters, but that these matters had not been fully developed, the government acted in bad faith by refusing to make a substantial assistance motion for Huskin. According to Huskin, a substantial assistance motion from the government is not a prerequisite for that departure given the government's bad faith in declining to make the motion.

▮ Because Huskin did not raise this objection with the district court during the sentencing hearing, we decline to consider this issue on appeal. *United States v. Prichett,* 898 F.2d 130, 131 (11th Cir.1990). Huskin argues that because the district court stated that without a motion from the government it was "powerless," she should not have been required to raise the "bad faith" issue. We disagree and do not find the district court's remark to be an indication that it would not consider any challenge to the government's position. The district court twice asked Huskin's counsel why it would not be powerless, and listened to defense counsel's full response, which contained no mention of prosecutorial bad faith. Similarly, we decline to consider Huskin's contention that the government breached her plea agreement. While the plea agreement does provide that if Huskin renders "substantial assistance," the government will file a substantial assistance motion, Huskin failed to complain of any breach of the plea agreement to the district court at the sentencing hearing.

Huskin next argues that her sentence is cruel and unusual in light of the circumstances of her particular case.[3] According to Huskin, her mandatory minimum five-year prison term followed by a four-year term of supervised release is unconstitutionally disproportionate to her offense in light of her minimal level of culpability and the disparity between her sentence and that given to others found guilty of the same offense and having a greater degree of culpability.

---

**3.** The eighth amendment states: "Excessive bail shall not be required, nor excessive fines im-

posed, nor cruel and unusual punishments inflicted." U.S. Const.

Huskin also contends that section 3553(e) violates fifth amendment due process principles.[4] According to Huskin, due process requires that she be afforded the opportunity of judicial review of all factual determinations on which her sentence is based. Huskin contends that the fact that the prosecutor's exercise of discretion in making a substantial assistance motion is unreviewable impermissibly shields a critical sentencing determination from appellate review.

Finally, Huskin argues that section 3553(e) violates separation of powers principles by delegating a legislative power to the executive branch (determination of the sentence range) and by usurping a judicial function (the finding of facts relevant to sentencing determinations).

Huskin's constitutional challenges to her sentence must fail. We reject the argument that the mandatory minimum sentencing provision of 21 U.S.C. § 960(b) violates the eighth amendment for the reasons stated in *United States v. Holmes*, 838 F.2d 1175, 1178 (11th Cir.) (mandatory minimum sentencing provision of 21 U.S.C. § 841(b) does not violate the eighth amendment), *cert. denied*, 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988), and we rejected the due process challenge to section 3553(e) in *United States v. Musser*, 856 F.2d 1484 (11th Cir.1988), *cert. denied*, 489 U.S. 1022, 109 S.Ct. 1145, 103 L.Ed.2d 205 (1989). Huskin's separation of powers argument is a variant of her due process claim and is without merit for the same reasons. Moreover, Huskin has not presented any new principles for which this court should narrow or reconsider its past decisions.

## CONCLUSION

For the reasons stated above, we affirm the appellants' convictions and sentences.

AFFIRMED.

---

**4.** The fifth amendment in relevant part states that no person shall "be deprived of life, liberty, or property, without due process of law...." U.S. Const.