[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15436
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 21, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00477-CR-CC-25-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TRINIDAD FLORES-SOTELO,
a.k.a. Espinilla,
a.k.a. Guicho,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 21, 2009)

Before HULL, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Trinidad Flores-Sotelo appeals his 240-month sentences for conspiracy to possess with intent to distribute cocaine and methamphetamine, possession with intent to distribute cocaine, and conspiracy to launder money. After review, we affirm.

## I. BACKGROUND

### A. Guilty Plea Hearing

Flores-Sotelo, indicted with 31 codefendants, pled guilty to three counts: (1) conspiracy to possess with intent to distribute at least five kilograms of cocaine and 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii) and (viii) and 18 U.S.C. § 2; (2) possession with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) and 18 U.S.C. § 2; and (3) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h).

At Flores-Sotelo's guilty plea hearing, the district court asked the government to outline briefly the evidence it would present before a jury if the case went to trial. The government first stated that Flores-Sotelo provided in excess of a million dollars in drug proceeds to a driver to Texas. The government then described Flores-Sotelo's role in the overall conspiracy and his use of a residence on St. James Place as a stash house, as follows:

2

The organization – or Mr. Flores-Sotelo headed a particular cell of this organization and they would receive large loads of cocaine, often as much as 300 kilograms per load, via tractor-trailer. They would receive the tractor-trailer and unload the cocaine in a warehouse. They used multiple warehouses in the Atlanta area. They would then take the cocaine to a stash house.

At least as of the time of his arrest October 12th, 2005, Mr. Flores-Sotelo used at least two stash houses, one on St. James Place and one on Rebecca Street, which are here in the Northern District of Georgia. They would take the cocaine from the warehouse to one of those houses and they would distribute them both here in the Atlanta area and to other areas, including the Carolinas. . . .

On October 12th – well, about a week prior to October 12th, Mr. Flores-Sotelo received a load of just over 300 kilograms of cocaine, a Schedule II controlled substance. They had not distributed, they were storing it at one of the stash houses when [Drug Enforcement Administration ("DEA")] executed search warrants on October 12th, 2005. . . .

Mr. Trinidad Flores-Sotelo possessed that cocaine. He did so with the intent to distribute and the drug proceeds that he would have subsequently obtained from the sale of cocaine and that he did obtain on earlier occasions would then be sent down to Texas for shipment into Mexico.

Flores-Sotelo's counsel stated that he and Flores-Sotelo "would agree" with "the material aspects and the substantive aspects" of the government's evidence proffer, but "would disagree" with "the leadership allegations." Flores-Sotelo himself also stated that, other than the "allegation of a leadership role," he agreed with the government's evidence proffer.

## B. PSI's Offense Conduct

The presentence investigation report ("PSI") detailed the relevant offense

conduct. DEA agents in Georgia, Texas, California, New York, and Florida began investigating a Mexican-controlled drug trafficking organization that imported drugs into the United States. Agents investigated two cells of the organization that operated independently but were connected by the same source, a supplier identified as "Tono." One cell was managed by the Defendant Flores-Sotelo and the other by Javier Alvarez-Lopez. Flores-Sotelo hired the DEA's confidential informant to transport drug trafficking proceeds from Flores-Sotelo in Atlanta to another location in Texas. DEA agents observed the confidential informant's delivery and searched the residence where the delivery was made. The agents seized approximately $4,500,000 in drug proceeds and a drug ledger indicating that Flores-Sotelo had delivered an additional $2,500,000 in drug proceeds from Atlanta during the previous weeks.

During the investigation, the DEA intercepted a number of Flores-Sotelo's telephone calls. The DEA overheard Flores-Sotelo discuss (1) the shipment, receipt, and disbursement of 100 kilograms of cocaine, (2) the receipt of a separate delivery of 114 kilograms of cocaine, and (3) the collection and delivery of $504,600 in drug proceeds, which the DEA obtained after observing Flores-Sotelo deliver a bag to a driver of a tractor trailer and after hearing Flores-Sotelo notify Tono that the delivery was complete.

4

The DEA also intercepted phone calls between Flores-Sotelo and his girlfriend, Ana Rojas-Rea, where they discussed the disbursement of drug proceeds. Referring to a person who would come to their residence to retrieve drug proceeds, Flores-Sotelo instructed Rojas-Rea over the telephone to "give Chilango 1,000 balls from the drawer where the stereo is." On another occasion, Flores-Sotelo spoke to Rojas-Rea about purchasing a new telephone because he used different telephone numbers as part of the drug conspiracy.

DEA agents also observed Flores-Sotelo coming and going from a rental residence on St. James Place in Lawrenceville, Georgia. Agents searched that residence on October 12, 2005, and recovered 305 kilograms of cocaine.

DEA agents searched Flores-Sotelo and Rojas-Rea's residence and recovered numerous cellular telephones, $410,326 in cash, one kilogram of cocaine, three ounces of cocaine base, a small amount of marijuana, heat sealers, and currency counting machines.[1] Agents also discovered a vehicle that was registered to Jesus Gonzalez-Diaz, who lived with Flores-Sotelo and was his driver. The vehicle was modified with a hidden compartment between the back seat and the trunk. According to the PSI, Flores-Sotelo directed the activities of

---

[1]The PSI stated that Flores-Sotelo and Rojas-Rea lived on Rebecca Street, but it did not indicate clearly whether their Rebecca Street residence was the same location as the Rebecca Street stash house.

Gonzalez-Diaz and Rojas-Rea but Flores-Sotelo himself operated at the direction of Tono.

## C. Advisory Guidelines Calculation

In determining Flores-Sotelo's base offense level, the PSI held him responsible for the 305 kilograms of cocaine found at the St. James Place residence and the three ounces of cocaine base and $410,326 that were found during the search of Flores-Sotelo's residence. Accordingly, the PSI set Flores-Sotelo's base offense level at 38, pursuant to U.S.S.G. § 2S1.1(a)(1). The PSI recommended (1) a two-level increase because he was convicted of a violation of 18 U.S.C. § 1956, pursuant to § 2S1.1(b)(2)(B), (2) a three-level increase for being the manager of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to § 3B1.1(b), and (3) a three-level reduction for acceptance of responsibility, pursuant to § 3E1.1(a)-(b). The PSI noted that Flores-Sotelo did not qualify for safety-valve relief under § 5C1.2(a) because he was a manager or supervisor and because he did not truthfully provide information to the government. With a total offense level of 40 and a criminal history category of I, Flores-Sotelo's advisory guidelines imprisonment range was 292 to 365 months.

## D. Sentencing

Flores-Sotelo did not object to the PSI's factual recitations of the offense

conduct. Rather, Flores-Sotelo objected only to three paragraphs in the PSI calculating his advisory guidelines range and recommending that (1) the 305 kilograms of cocaine from the St. James Place residence were attributable to him, (2) he should receive a three-level role enhancement for being a manager or supervisor, and (3) he was ineligible for safety-valve relief. In the PSI itself, the probation officer listed Flores-Sotelo's objections and responded that Flores-Sotelo (1) had a "notable connection" to the St. James Place residence because "the defendant [Flores-Sotelo] and others established power for the St. James 'stash' house on April 20, 2005"; (2) managed Rojas-Rea and the cell involved at least five participants; and (3) was not eligible for safety-valve relief because he was a manager or supervisor.

At the beginning of the sentencing hearing, the district court adopted all of the PSI's factual findings and guidelines calculations except for the three paragraphs to which Flores-Sotelo objected. Flores-Sotelo never challenged the accuracy of the information in the probation officer's responses to his objections. At sentencing, Flores-Sotelo argued that even if he had been seen at the St. James Place residence and had established power there in April 2005, this was insufficient to connect him to the 305 kilograms of cocaine at the St. James Place residence.

After hearing from counsel for the government and Flores-Sotelo, the district court overruled Flores-Sotelo's sentencing objections. First, the district court found that Flores-Sotelo had a "notable connection" to the St. James Place residence and specified that "[o]ne of those notable connections" was that Flores-Sotelo and others established power for the St. James Place residence in April 2005. Second, the district court found that the three-level managerial role enhancement applied because the evidence clearly established that (1) there were two cells involved in the drug conspiracy, one of which was headed by Flores-Sotelo, (2) the cell headed by Flores-Sotelo involved five participants who were identified by way of telephone surveillance, and (3) at the time of his arrest, Flores-Sotelo had drugs in his house. Third, the district court found that Flores-Sotelo was ineligible for safety-valve relief because of his role as a manager or supervisor and, alternatively, because the prosecutor did not believe that Flores-Sotelo was truthful during his debriefing.

The district court stated that it had considered the Sentencing Guidelines, the 18 U.S.C. § 3553(a) factors, the parties' oral arguments, and the facts and circumstances surrounding the conspiracy and the extent of Flores-Sotelo's involvement. The district court then sentenced Flores-Sotelo to 240 months' imprisonment on each of the three counts, to run concurrently. Thus, Flores-Sotelo

received sentences below his advisory guidelines imprisonment range of 292 to 365 months.

## II. DISCUSSION

On appeal, Flores-Sotelo raises four sentencing issues. We review each in turn.

### A. Attribution of the St. James Place Cocaine

Flores-Sotelo claims that the district court erred in attributing the 305 kilograms of cocaine seized from the St. James Place residence to him because there was insufficient evidence to tie him to the St. James Place residence.[2]

We disagree because the overall record adequately supports the district court's fact-finding that the St. James Place cocaine was attributable to Flores-Sotelo. As found by the district court, one of Flores-Sotelo's "notable connections" to the residence was that Flores-Sotelo and others established power for the St. James Place stash house on April 20, 2005. There is also the undisputed statement in the PSI that, during the investigation, agents had seen Flores-Sotelo at the St. James Place residence. Moreover, Flores-Sotelo pled guilty to being a key figure in a drug conspiracy. At his plea hearing, the government proffered that

---

[2]We review a district court's determination of the drug quantity used to establish a defendant's base offense level for clear error. United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000).

Flores-Sotelo and his drug ring used the St. James Place residence as a stash house and that Flores-Sotelo recently stashed just over 300 kilograms of cocaine there, where it was seized by police officers. In response, Flores-Sotelo and his lawyer stated that they substantially agreed with the government on all points except for the government's allegations of leadership. See Untied States v. Saunders, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) ("[T]he findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." (quotation marks omitted)). Given the overall record in this case, we cannot say the district court clearly erred in finding that the government met its burden of proving a sufficient link between Flores-Sotelo, a key figure in a drug ring, and the cocaine at St. James Place, one of the drug ring's stash houses.[3] See United States v. Butler, 41 F.3d 1435, 1444 (11th Cir. 1995) (stating that the government must establish the drug quantity by a

_____

[3]At the sentencing hearing, the government proffered that, during debriefing, Flores-Sotelo told the government that the St. James Place residence was one of the places the drugs were kept and that Tono in Mexico was mad at him for having 305 kilograms there with no one protecting it. Flores-Sotelo's counsel objected to the use of this statement. The government responded that Flores-Sotelo had opened the door by some of his arguments referencing the debriefing. The district court stated that it would not consider at all Flores-Sotelo's debriefing statements. There is no cross-appeal and we thus do not consider any statements by Flores-Sotelo in the debriefing. We also need not address the government's alternative argument that the district court's attribution of the 305 kilograms of cocaine from the St. James Place residence to Flores-Sotelo was harmless error.

preponderance of the evidence).

## B. Manager or Supervisor Enhancement

Flores-Sotelo next argues that the district court erred by not sufficiently explaining the basis for its conclusion that he was the head of one of the two cells prosecuted and thus giving him a three-level enhancement under U.S.S.G. § 3B1.1(b) for being a manager or supervisor.[4]  Additionally, Flores-Sotelo claims that the government did not establish with specific evidence that he led a cell and that the PSI did not set forth a sufficient factual basis to support such a finding. Flores-Sotelo notes that he worked at the direction of Tono in Mexico.

Under § 3B1.1(b), a three-level enhancement is appropriate where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).  To qualify for an enhancement under § 3B1.1(b), the defendant need only manage or supervise one other participant.  See U.S.S.G. § 3B1.1 cmt. n.2.

The district court did not clearly err in enhancing Flores-Sotelo's sentence for his role as a manager or supervisor.  First, Flores-Sotelo's argument that the

---

[4]"This Court has long and repeatedly held that a district court's determination of a defendant's role in the offense is a finding of fact to be reviewed only for clear error."  United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

district court did not adequately explain its ruling is without merit, as the district court specifically stated that it based its decision on the facts set forth in the PSI.

Nor was the district court's fact-finding clear error. The unobjected-to facts in Flores-Sotelo's PSI show that (1) Flores-Sotelo operated the Atlanta cell of a drug trafficking organization in which there were at least five participants: Flores-Sotelo, Rojas-Rea, Gonzalez-Diaz, Tono, and Chilango; (2) Gonzalez-Diaz was Flores-Sotelo's driver and worked at his direction; and (3) Rojas-Rea operated at Flores-Sotelo's direction, as shown by the recorded telephone conversation in which Flores-Sotelo directs Rojas-Rea to give drug proceeds to a person who would visit their residence.[5]

Finally, Flores-Sotelo's argument that he worked at the direction of Tono is irrelevant. Having a subordinate role to another participant (Tono) does not preclude a participant from supervising or managing other participants (such as Gonzalez-Diaz or Rojas-Rea). United States v. Jones, 933 F.2d 1541, 1546-47 (11th Cir. 1991).

---

[5]Facts not challenged in the PSI are deemed admitted as true. See United States v. Shelton, 400 F.3d 1325, 1330 (11th Cir. 2005).

Flores-Sotelo relies on United States v. Williams, 527 F.3d 1235, 1248-49 (11th Cir. 2008), to argue that Rojas-Rea was a minor participant over whom he had an insignificant degree of control. However, Rojas-Rea's role was more than the de minimis role described in Williams because the unobjected-to facts in the PSI show that, unlike the appellant in Williams, Rojas-Rea was a knowing participant who kept drugs at her home, discussed the distribution of drug proceeds with Flores-Sotelo, and pled guilty to a charge related to the conspiracy.

12

## C. Safety-Valve Determination

Flores-Sotelo next argues that the district court was required to make its own independent decision as to his truthfulness and erred in relying on the government's assessment of his truthfulness in determining that he was ineligible for safety-valve relief under § 5C1.2(a).[6] To be eligible for safety-valve relief, a defendant must, inter alia, "truthfully provide[] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan" and not be "an organizer, leader, manager, or supervisor of others in the offense." U.S.S.G. § 5C1.2(a). In light of our conclusion that the district court did not err in determining that Flores-Sotelo was a manager or supervisor, the district court did not err in determining that he was ineligible for safety-valve relief for that reason alone. Accordingly, we need not decide whether the district court erred as to Flores-Sotelo's truthfulness in debriefing.

## D. Substantive Reasonableness

Flores-Sotelo also argues that his below-the-guidelines sentences were unduly severe and violated 18 U.S.C. § 3553 because they were substantially

---

[6]When reviewing a district court's safety-valve determination, we review for clear error a district court's factual determination and de novo the court's legal interpretation of the guidelines. United States v. Poyato, 454 F.3d 1295, 1297 (11th Cir. 2006).

greater than necessary to achieve the goals of the Sentencing Reform Act. However, Flores-Sotelo points to no specific reason why his sentences are unreasonable.

We review the reasonableness of a sentence through a two-step process using a deferential abuse-of-discretion standard. United States v. Pugh, 515 F.3d 1179, 1189-90 (11th Cir. 2008) (relying upon Gall v. United States, 552 U.S. 38, __, 128 S. Ct. 586, 594, 597 (2007)). First, we look at whether the district court committed any significant procedural error, such as miscalculating the advisory guidelines range, treating the guidelines range as mandatory, or failing to consider the § 3553(a) factors. Id. at 1190. Second, we examine whether the sentence is substantively reasonable by considering the totality of the circumstances and evaluating whether the sentence achieves the sentencing purposes in § 3553(a). Id. at 1190-91; United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

Here, the district court did not abuse its discretion in imposing 240-month imprisonment sentences that were below his advisory guidelines range of 292 to 365 months. First, as previously discussed, the district court committed no procedural error in calculating Flores-Sotelo's advisory guidelines range. Moreover, before imposing Flores-Sotelo's sentences, the district court stated that it considered the advisory guidelines range and the § 3553(a) factors. Flores-

14

Sotelo offers no specific reason why his below-the-guidelines-range sentences are unreasonable, and, in any event, we discern none.

For the foregoing reasons, we affirm Flores-Sotelo's 240-month sentences.

**AFFIRMED.**