[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14929
Non-Argument Calendar
_____

D.C. Docket No. 7:12-cr-00003-HL-TQL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARTIN TERRELL TILLMAN,
a.k.a. Bo Gator,
a.k.a. Gator,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(August 29, 2013)

Before CARNES, Chief Judge, BARKETT and BLACK, Circuit Judges.

PER CURIAM:

Martin Tillman appeals his conviction and sentence of life imprisonment, imposed after his conviction by jury trial for one count of conspiracy to possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 846. Tillman asserts several issues on appeal, which we address in turn. After review, we affirm Tillman's conviction and sentence.

*Transcripts*

Tillman first contends the district court erred in allowing the jury to consider transcripts of recorded telephone conversations during its deliberations in the jury room without the accompanying recordings.

District courts have "the authority to allow juries to read properly authenticated transcripts while listening to taped conversations." *United States v. Garcia*, 854 F.2d 1280, 1283 (11th Cir. 1988). "[T]he use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence." *United States v. Onori*, 535 F.2d 938, 947 (5th Cir. 1976).[1] The proper protocol in this Circuit when a party disputes the accuracy of a transcript is for "each side [to] produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on

---

[1] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

evidence supporting the accuracy of its own version or challenging the accuracy of the other side's version." *United States v. Hogan*, 986 F.2d 1364, 1376 (11th Cir. 1993) (quotations omitted) (concluding a defendant's claim of error failed because he did not offer his own transcript and did not point out inaccuracies in the government's transcript). "A district court need not find that the transcript is perfectly accurate prior to its admission." *Id.* However, in order for transcripts to be admitted into evidence, "there must be some evidence that the transcripts are accurate[,] that the words are accurately reproduced[,] and the voices accurately identified." *United States v. Rochan*, 563 F.2d 1246, 1251 (5th Cir. 1977).

It is not error to allow a transcript to go into the jury room unless the defendant demonstrates the transcript either is inaccurate or causes him specific prejudice. *United States v. Williford*, 764 F.2d 1493, 1503 (11th Cir. 1985). "[T]ranscripts are evidence admissible to assist the jury in identifying speakers, and . . . absent anything more than a generalized claim of prejudice, we will not find error in the transcripts being allowed in the jury room." *United States v. Nixon*, 918 F.2d 895, 901 (11th Cir. 1990) (citations omitted).

The district court did not abuse its discretion in allowing the jury to consider the transcripts of recorded telephone conversations. *See United States v. Hawkins*, 905 F.2d 1489, 1493 (11th Cir. 1990) (reviewing an evidentiary ruling for an abuse of discretion). Agent Jim Grady and Sergeant Rob Picciotti testified the transcripts

3

they prepared were accurate to the best of their abilities, thus satisfying the requirement that "there must be some evidence that the transcripts are accurate[,] that the words are accurately reproduced[,] and the voices accurately identified," *see Rochan*, 563 F.2d at 1251.  Further, throughout the trial, Tillman did not object to the admission of any of the transcripts prepared by the Government.

On two occasions, however, Tillman challenged the accuracy of the transcripts through cross-examination.  On cross-examination, DEA Special Agent Rufus Wallace acknowledged that one of the transcripts contained notations indicating that, at certain points in one of the recorded conversations, Isaac Camon was speaking "to Tillman," but Tillman was not on the recording, and Wallace could not say that Camon was actually addressing Tillman at those points.  Second, Christopher Phillips acknowledged on cross-examination that, as shown on one of the video recordings of his interactions with Tillman, he had spoken with Tillman about HGH, but this did not appear in the accompanying transcript.

The Government effectively negated Tillman's first challenge by eliciting testimony from Wallace that, on the recording, Camon indicated he was speaking to "Gator," Tillman's nickname.  As for the second challenge, the inaccuracy in the Phillips transcript cannot translate the district court's decision to allow the

4

transcript into the jury room into error because Tillman makes no more than a generalized claim of prejudice. *See Nixon*, 918 F.2d at 901.[2]

*Drug quantity finding*

Tillman challenges his base offense level of 38 under U.S.S.G. § 2D1.1(c)(1) on the grounds that (1) the district court failed to make an explicit finding of the quantity of drugs for which he was responsible, and (2) the calculation in the presentence investigation report (PSI) of the quantity of drugs involved in his offense was speculative. We review for clear error the district court's findings of fact supporting a sentence, including its determination of the drug quantity attributable to a defendant. *United States v. Almedina*, 686 F.3d 1312, 1315 (11th Cir.), *cert. denied*, 133 S. Ct. 629 (2012). A factual finding at sentencing is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Barrington*, 648 F.3d 1178, 1195 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 1066 (2012).

---

[2] In any event, even if the court erred in allowing that particular transcript into the jury room, the error was harmless because the court instructed the jury the recordings were the real evidence and the jury could re-listen to the recordings if it wished to do so. Moreover, the issue of the Phillips transcript's inaccuracy was squarely before the jury during Tillman's closing argument. Finally, given the relatively tangential nature of Phillips' testimony, and the overwhelming evidence of guilt presented by the testimony of the remaining witnesses, any consideration by the jury of the possibly inaccurate transcript "had no substantial influence on the outcome," and, therefore, reversal is not warranted. *See Hawkins*, 905 F.2d at 1493 ("[W]here an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted.").

For sentencing purposes, the government bears the burden of establishing drug quantity by a preponderance of the evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).  The district court must ensure that the government carries this burden by presenting reliable and specific evidence. *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995).  "Where there is no drug seizure or the drug amount seized does not reflect the scale of the offense, the court shall approximate the drug quantity." *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996) (quotations omitted).  In estimating the drug quantity attributable to the defendant, the court may rely on evidence demonstrating the average frequency and amount of drug sales over a given period of time. *Id.*  This determination "may be based on fair, accurate, and conservative estimates of the quantity of drugs attributable to a defendant, . . . [but it] cannot be based on calculations of drug quantities that are merely speculative." *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998).

The district court did not clearly err in applying a base offense level of 38. *See* U.S.S.G. § 2D1.1(c)(1) (assigning a base offense level of 38 where the defendant's offense involves 150 kilograms or more of cocaine).  Although the district court did not make explicit factual findings about the quantity of drugs involved in Tillman's offense, its failure to do so does not preclude meaningful appellate review because clearly identifiable evidence amply supported its

6

sentencing decision. *See United States v. Tobin*, 676 F.3d 1264, 1309 (11th Cir.), *cert. denied*, 133 S. Ct. 658 (2012) (explaining in order to facilitate appellate review, a district court should make explicit factual findings that underpin its sentencing decision, "[b]ut the failure to make specific findings does not preclude meaningful appellate review if the court's sentencing decision is based on 'clearly identifiable evidence'").

William McKeithen testified that, six months after his release from prison in March 2008, or September 2008, and up until mid-2010, he obtained a kilogram of cocaine once or twice weekly from Camon and Tillman. This testimony leads to a conservative estimate of 72 kilograms of cocaine attributable to Tillman through the conspiracy (1 kilogram per week for 18 months equals 72 kilograms). Gerald Williams testified that he obtained at least 1 kilogram of cocaine from the conspiracy on each of 15 to 21 trips to Ray City. After Camon and Tillman told him it was too dangerous to conduct business in Ray City due to the presence of a camera, he obtained cocaine from the conspiracy between 5 and 9 times in Valdosta. This testimony leads to a conservative estimate of 20 kilograms of cocaine attributable to Tillman through the conspiracy (1 kilogram per trip for 20 trips equals 20 kilograms). Tony McKinney testified that, between 2002 and 2003, he obtained around 2 or 3 kilograms of cocaine from the conspiracy approximately 10 times. This testimony leads to a conservative estimate of 20

7

kilograms of cocaine attributable to Tillman through the conspiracy (2 kilograms per transaction for 10 transactions equals 20 kilograms). Between 2005 and 2008, McKinney obtained 10 or 11 kilograms of cocaine from the conspiracy approximately 15 or 20 times. This testimony leads to a conservative estimate of 150 kilograms of cocaine attributable to Tillman through the conspiracy (10 kilograms per transaction for 15 transactions equals 150 kilograms).

Accordingly, the testimony of just these 3 witnesses leads to a conservative estimate of 262 kilograms of cocaine attributable to Tillman through the conspiracy. This estimate is not "speculative," *see Zapata*, 139 F.3d at 1359, but rather is based on testimony about the average frequency and amount of drug sales over a given period of time, *see Frazier*, 89 F.3d at 1506. Moreover, Tillman offers no argument to suggest that this testimony was inaccurate or untrustworthy. Accordingly, the district court did not clearly err in overruling Tillman's objection to the base offense level.

*Possession of firearm enhancement*

Tillman asserts the court erred in applying a two-level enhancement for possession of firearm, under § 2D1.1(b)(1), because it failed to make an explicit finding that the individuals who possessed firearms were his co-conspirators. Whether a firearm was possessed in connection with an offense is a factual finding

8

that, when used for sentencing purposes, we review for clear error. *United States v. McClain*, 252 F.3d 1279, 1284 (11th Cir. 2001).

Under the Sentencing Guidelines, a two-level enhancement is added where "a dangerous weapon (including a firearm) was possessed" in connection with a drug offense. U.S.S.G. § 2D1.1(b)(1). The enhancement applies where a firearm was possessed by a co-conspirator, provided the following requirements are met: "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." *United States v. Fields*, 408 F.3d 1356, 1359 (11th Cir. 2005) (quotations omitted).

The enhancement applies "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, comment. (n.11(A)). The government must show "the firearm was present at the site of the charged conduct" or the firearm was possessed "during conduct associated with the offense of conviction." *United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). Once the government meets this burden, then the evidentiary burden shifts to the defendant to demonstrate that a connection between the weapon and the offense was "clearly improbable." *Id.*

9

As an initial matter, the district court did not fail to make a finding that Tillman's co-conspirators possessed firearms in connection with the offense. The court explicitly stated that Tillman's "associates and confederates" possessed firearms "in this conspiracy." Therefore, the district court stated the individuals who possessed firearms were Tillman's co-conspirators.

The evidence at trial showed overwhelmingly that Camon was Tillman's chief co-conspirator, and Grady testified that Camon twice was found to have firearms in his home, in 2006 and 2011. Additionally, Grady testified two other members of the conspiracy were arrested in the possession of a handgun. While they did not feature prominently in the testimony at trial, Agent Grady stated these two individuals were arrested in a car registered to Camon while on a trip to Texas in 2005 to purchase cocaine for the Camon organization, thus evidencing their membership in the conspiracy.

Their possession of the handgun "during conduct associated with the offense of conviction," a trip to obtain drugs for the conspiracy, and Camon's possession of firearms in his home, a "site of the charged conduct," show these firearms were possessed in furtherance of the conspiracy. *See id.* Tillman's participation in the conspiracy began, at the earliest, in 1999 or 2000, when he began selling cocaine to McKeithen. Accordingly, all of these firearms possessed by Tillman's

co-conspirators in furtherance of the conspiracy were possessed while Tillman was a member of the conspiracy.

Lastly, Grady testified about a conversation between Tillman and Camon about Camon's then-pending plea to a firearm offense. This constituted direct evidence of Tillman's knowledge that Camon had possessed firearms, thus indicating that "co-conspirator possession was reasonably foreseeable" to Tillman. *See Fields*, 408 F.3d at 1359. Accordingly, because Tillman's co-conspirators possessed firearms in furtherance of the conspiracy, and such possession was reasonably foreseeable to Tillman, the district court did not err in applying the two-level enhancement.

*Maintenance of premises for the manufacture/distribution of drugs*

Tillman argues the court erred in applying a two-level enhancement, under § 2D1.1(b)(12), for maintenance of a premises for the manufacture or distribution of drugs. Whether or not a defendant maintained a premises for the manufacture or distribution of drugs is a factual issue subject to clear error review. *See Barrington*, 648 F.3d at 1195.

Section 2D1.1(b)(12) was new to the November 2011 Guidelines Manual, and implemented a directive from the Fair Sentencing Act, which directed the Sentencing Commission to add a two-level enhancement "as generally described in . . . (21 U.S.C. 856)." Fair Sentencing Act of 2010, Pub. L. No. 111-220, § (6)(2),

11

124 Stat. 2372, 2373 (2010).  The "disorderly house" statute makes it illegal to "knowingly open, lease, rent, use, or maintain any place, whether permanently or temporarily, for the purpose of manufacturing, distributing, or using any controlled substance."  21 U.S.C. § 856(a)(1).  Section 2D1.1(b)(12) of the Guidelines adds a two-level enhancement "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance," including storage of a controlled substance for the purposes of distribution.  U.S.S.G. § 2D1.1(b)(12) & comment. (n.17).  The court should consider "whether the defendant held a possessory interest in . . . the premises" and "the extent to which the defendant controlled access to, or activities at, the premises."  U.S.S.G. § 2D1.1, comment. (n.17).  While, "[m]anufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, [it] must be one of the defendant's primary or principal uses for the premises."  *Id.*

We have held the "critical elements" of the offense for a violation of § 856(a)(1) are "(1) knowingly exercising some degree of control over the premises; (2) knowingly making the place available for the use alleged in the indictment; and (3) continuity in pursuing the manufacture, distribution, or use of controlled substances."  *United States v. Clavis*, 956 F.2d 1079, 1090 (11th Cir. 1992).  We rejected the contention that regular use of a premises "as a site from which to distribute cocaine is, by itself, sufficient" to constitute "maintaining" a

12

premises, but rather stated that "[a]cts evidencing such matters as control, duration, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity" constituted evidence of "maintaining." *Id*. at 1091.

The district court did not clearly err by determining Tillman maintained a premises for the manufacture or distribution of drugs. Assuming, *arguendo*, that Tillman's home in Ray City and the house in Lowndes County do not meet the elements we have found necessary for a conviction under § 856(a)(1), the apartment in Ray City meets all three elements, and this would also support the § 2D1.1(b)(12) enhancement. There is no indication this apartment was maintained for any purpose other than drugs. Agent Grady testified the conspiracy's transactions shifted to the Ray City apartment after he placed the camera outside Tillman's home, and Sargent Picciotti testified he observed members of the conspiracy and "random associates" frequenting the apartment and conducting drug transactions. McKeithen testified he obtained cocaine at the apartment. Mack testified Camon had told him the brick house was a "stash house." He also testified he assisted Camon and Tillman in "re-rocking" cocaine at the house.

Tillman maintained the Ray City apartment by "exercising some degree of control over the premises," including by "supervising" the apartment. *See Clavis*,

13

956 F.2d at 1090-91.  Sargent Picciotti testified that, while he observed many members of the conspiracy and "random associates" frequenting the apartment late into the night, it was Tillman who would "g[e]t up very early and tend[] to be over there."  Although other members of the conspiracy also exercised some control over the apartment by conducting drug transactions there, Picciotti's testimony indicates that it was Tillman who "maintained" the apartment.   Accordingly, because Tillman maintained the Ray City apartment for the manufacture or distribution of drugs, the district court did not clearly err in applying the two-level § 2D1.1(b)(12) enhancement.

*Leadership role enhancement*

Lastly, Tillman contends the court erred in applying the three-level leadership-role enhancement for being a manager of supervisor, under U.S.S.G. § 3B1.1(b), because the court did not make specific findings by a preponderance of the evidence that attributes of his participation in the conspiracy evidenced a leadership role.  While we review the district court's determination as to a defendant's role in the offense for clear error, the application of a guideline to a particular factual situation is a question of law that this Court reviews *de novo*. *United States v. Alred*, 144 F.3d 1405, 1421 (11th Cir. 1998).

The Sentencing Guidelines provide for a three-level increase if the defendant "was a manager or supervisor (but not an organizer or leader) and the criminal

14

activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). "[A] section 3B1.1 enhancement . . . requires authority in the organization that perpetrates the criminal conduct, the exertion of control, or leadership." *Alred*, 144 F.3d at 1422. Where the defendant had the responsibility of ensuring the operation would succeed, as evidenced through the defendant's unilateral decisions, that is sufficient evidence to prove a managerial role and support a § 3B1.1(b) enhancement. *See United States v. Jones*, 933 F.2d 1541, 1547 (11th Cir. 1991). A defendant's subordinate role to another co-conspirator does not absolve him of his supervisory role in coordinating and managing the delivery and transportation of a drug shipment. *Id.* at 1546-47.

While there was evidence Tillman held a position subordinate to Camon, such that Camon quoted the price of cocaine to distributors, and directed Tillman as to when and where to make drug deliveries, there was also evidence Tillman held a great deal of responsibility in the organization. This included evidence of (1) his control over the organization's finances, (2) his corruption of law enforcement; and (3) his quality control over cocaine supplied to the organization. This evidence amply demonstrated Tillman's high "degree of participation in planning or organizing the offense." *See* U.S.S.G. § 3B1.1, comment. (n.4).

15

More importantly, there was evidence Tillman directed subordinate members of the conspiracy.[3] For example, McKeithen testified that, on occasion, he had gone to Tillman's house to speak with Tillman, who would direct him to another location for the consummation of a drug transaction. This evidence showed Tillman directed others to ensure the drug transactions would succeed. *See Jones*, 933 F.2d at 1547. Tillman's role subordinate to Camon's does not absolve him of his supervisory role in coordinating and managing the delivery and transportation of the drug shipments. *Id.* at 1546-47.

The district court did not err in applying the three-level § 2B1.1(b) enhancement. The Government presented ample evidence at trial that Tillman had a managerial or supervisory leadership role in the conspiracy.

*Conclusion*

Upon review of the record on appeal, and after consideration of the parties' appellate briefs, we affirm Tillman's conviction and sentence.

**AFFIRMED.**

---

[3] The Government was incorrect to argue at sentencing that Tillman's leadership role was evidenced by the exercise of decision-making authority as to whether Bray could purchase drugs from the Camon organization. In fact, the evidence adduced at trial showed that it was Camon, driving his lime-green Dodge Challenger and going by his moniker "Six," who had approved the sale of drugs to Bray. Tillman's role was limited to delivering the cocaine that Bray later purchased.

16